## CITY OF DETROIT v. DETROIT CITY RY. CO. et al.

### (Circuit Court, E. D. Michigan. May 31, 1893.)

### No. 3,320.

1. MUNICIPAL CORPORATIONS—POWERS.

Municipal corporations can exercise only such powers as are clearly comprehended in the legislative grant, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any doubt arising out of the terms of the grant should be resolved in favor of the public. Minturn v. Larue, 23 How. 435, followed.

2. SAME—LAW OF MICHIGAN—LIMITATION ON POWER OF LEGISLATURE.

This rule prevails in Michigan, and the provisions of the state constitution (article 15, § 13) that the legislature shall provide for the incorporation of cities and villages, and shall restrict their powers of taxation, borrowing, etc., and (article 4, § 38) that the legislature shall confer upon local governments such local administrative and legislative power "as they may deem proper," and (article 4, § 23) that the legislature shall not vacate or alter any highway laid out by the local authorities, do not create any power in municipal corporations, but merely restrict the manner in which the legislature shall confer such power, when it sees fit to do so. Taylor v. Railway Co., 45 N. W. Rep. 335, 80 Mich. 77, followed.

3. SAME—CONTROL OF STREETS—STREET RAILWAYS.

The general power given to the city council of Detroit (by Laws Mich. 1869, p. 1692, § 22, pars. 11, 13, which was a continuation of similar grants in 1827 and 1857) to establish, alter, and abolish streets; to grade, pave, repair, and prohibit the incumbering thereof; and to regulate the manner in which they shall be used and enjoyed,—is merely legislative, and does not include the power to grant a vested right, for 30 years, to build and operate a street railway in the streets, although such use of the streets may be permitted by license revocable at will. Brown v. Duplessis, 14 La. Ann. 842; State v. Corrigan Consolidated St. Ry. Co., 85 Mo. 274; and Atchison St. Ry. Co. v. Missouri Pac. Ry. Co., 3 Pac. Rep. 284, 31 Kan. 661,—distinguished.

4. SAME—LIMITATION OF STREET-RAILWAY FRANCHISE.

Laws Mich. 1861, pp. 11, 12, §§ 33, 34, authorized the formation of companies, with a corporate life limited to 30 years, to build and operate street railways, subject to the consent of the municipal authorities, and "under such regulations * * * as said authorities may from time to time prescribe." Laws 1867, p. 257, added the proviso that, after such consent had been given and accepted, said authorities should make no regulations "whereby the rights or franchises so granted shall be destroyed or unreasonably impaired, or such company deprived of the right of constructing * * * and operating such railway." The general street-railway act of 1867 provided that companies organized thereunder for the term of 30 years might own and operate a street railway, or extend the same, with the consent of any city, by ordinance, and under regulations prescribed by such ordinance. It is the policy of Michigan (Const. art. 15, § 10) to check the growth of corporate wealth and power, by limiting to the term of 30 years the lives of corporations, except municipal, commercial, railway, plank-road, and canal corporations. *Held,* that a city had no power to grant a vested interest in the streets, to own and operate a street railway therein for a time longer than the life of the grantee corporation. Swan, District Judge, dissenting. State v. Laclede Gaslight Co., 14 S. W. Rep. 974, 15 S. W. Rep. 383, and 102 Mo. 472; People v. O'Brien, 18 N. E. Rep. 692, 111 N. Y. 1; and New Orleans City & L. R. Co. v. New Orleans, 12 Sup. Ct. Rep. 406, 143 U. S. 192,—distinguished.

5. SAME—ASSIGNMENT OF FRANCHISE.

A grant by a city under the said acts was assigned to a corporation whose life was limited to a shorter time than that of the grantee corporation. It was thereafter assigned to a new corporation, whose life was limited to a longer time than that of the grantee. *Held,* that the grant was good in the hands of this new corporation, as against the city, until such time as the life of the grantee corporation was limited to.

6. NUISANCE — RAILWAY TRACKS IN STREET — EXPIRATION OF FRANCHISE—INJUNCTION.

The city of Detroit passed an invalid ordinance to extend the right of a corporation to own and operate a street railway beyond the time to which the life of the corporation was by law limited. The grantee assigned all its property and franchises to a second corporation. Thereafter, an ordinance was passed, fixing the time beyond which the tracks should not remain in the streets at the day on which the life of the grantee corporation would expire. *Held,* that the continuance of the tracks in the streets after that day was a public nuisance, which a court of equity would abate by injunction. Swan, District Judge, dissenting.

7. SAME—INJUNCTION—PARTIES IN PARI DELICTO — MUNICIPAL CORPORATIONS.

The rule that both parties to an ultra vires contract are in pari delicto, and therefore a court of equity will not interpose to restore to one of them rights which it has thus parted with, is inapplicable to a municipal corporation whose trustees attempt to make an invalid grant, and in such case the right of the public to equitable relief is not prejudiced. Swan, District Judge, dissenting.

8. JUDGMENT—EFFECT—RES JUDICATA—INVALID ORDINANCE.

A city, by ordinance, extended the right of a corporation to own and operate a street railway beyond the time to which the life of the corporation was by law limited, which extension was void by the law of the state. Thereafter, the city brought suit to compel the corporation, whose life had not then expired, to pay more taxes than the amount fixed in the ordinance, and the judgment was that the city had power to stipulate the amount of such taxes, and bind itself as by a contract. *Held,* that the question of the validity of the contract for its entire term was not res judicata in a suit by the city to compel the corporation to abandon the streets when its life expired by law.

9. MUNICIPAL CORPORATIONS—INVALID GRANT—ESTOPPEL.

The fact that such extension ordinance was accepted, and quietly acquiesced in, by both parties, for 10 years, during the term of the original grant, and that the corporation expended large sums of money on the faith thereof, does not estop the city from denying the validity of the extension after the expiration of the original grant, as against the grantee corporation, though it might be estopped as against an assignee thereof by its dealings directly with such assignee, if such assignee was a corporation whose life extended beyond the period of the extended grant. Swan, District Judge, dissenting.

In Equity. Suit in the circuit court of Wayne county, Mich., by the city of Detroit, against the Detroit City Railway Company, the Detroit Citizens' Street-Railway Company, Sidney D. Miller and William K. Muir, trustees, and the Washington Trust Company of the City of New York, for an injunction to compel the removal of tracks from the streets, and to restrain respondents from operating a street railway therein. The Washington Trust Company of the City of New York removed the cause to this court, and a motion to remand was thereafter denied. 54 Fed. Rep. 1. Complainant's motion to postpone the hearing on bill and answer or to dismiss the complaint, was also denied. 55 Fed. Rep. 569. The

hearing is now on bill and answer. Injunction refused as to certain lines of rails, and further hearing ordered as to other lines.

John J. Speed, E. A. Kent, and Benton Hanchett, for complainant.

Henry M. Duffield, John C. Donelly, Fred A. Baker, Ashley Pond, Otto Kirchner, and Sidney T. Miller, for defendants.

Before TAFT, Circuit Judge, and SWAN, District Judge.

TAFT, Circuit Judge. This was a bill in chancery, originally filed in the circuit court for Wayne county, Mich., by the city of Detroit, against the Detroit City Railway, the Detroit Citizens' Street-Railway Company, Sidney D. Miller and William K. Muir, trustees, and the Washington Trust Company of the City of New York. The defendants all answered in the state court, and then, on the petition of the Washington Trust Company, the case was removed to this court on the ground of local prejudice. See City of Detroit v. Detroit City Ry. Co., 54 Fed. Rep. 1. The case was heard on bill and answer.

The object of the bill was to obtain an injunction, mandatory and prohibitory, to compel the Detroit Citizens' Street-Railway Company, operating a street railway in that city, to remove its tracks from the streets, and to prevent its further running of cars after May 9, 1893. The case set out in the bill was that the easement of the Citizens' Company to occupy the streets ended upon that date, and that the easement until 1909, claimed by the Citizens' Company under assignment of mesne conveyance from the Detroit City Railway, was invalid, because the city council had no power, under the laws of Michigan, to confer an easement upon the Detroit City Railway to last beyond its corporate life, which ended May 9, 1893. The answers of the several defendants whose interests are stated below, after denying the claim of the bill that the grant to the City Railway of the easement until 1909 was invalid, and, after pleading estoppel against the city on two grounds, prayed that the answers might be treated as cross bills; that an ordinance of the city council of 1892, purporting to repeal the 1909 grant, should be decreed invalid, as impairing contract obligations; and that the city and its officers should be enjoined from interfering with the lawful occupation of the streets by the Citizens' Company. The facts to be gathered from the answers and the bill were as follows:

By ordinance approved the 24th of November, 1862, the common council of the city of Detroit conveyed to one Wilcox and associates, their successors and assigns, who should form a corporation for that purpose, the exclusive right to construct, maintain, and operate a street railway, with a single or double track, for 30 years from the date of the ordinance, upon certain named streets of Detroit, and upon such other streets as the common council might direct, and the company assent to, in writing, provided, that if the assent of the company was not forthcoming within 30 days the council might then give the privilege to any other company. The ordinance provided that the track should be laid in such a way as least to obstruct

public travel; that if it should become necessary to relay the tracks, in case the city graded, paved, or repaved the streets, the relaying should be done at the expense of the company; that the company should be required to keep the surface of the streets, inside the rails, and for two feet four inches outside thereof, in good order and repair, provided that on the paved portions of the streets the materials for repaving should be supplied at the expense of the city; that the railways within the named streets should be completed within certain fixed times, or in default thereof the rights conferred would be lost therein; that the company should pay to the city, after five years, the annual license fee of $15 a car; and that rights conferred on Wilcox and his associates should vest, without further act or consent of the city, in the corporation they proposed to form. The ordinance was accepted by the grantees or their successors, who on May 9, 1863, organized the corporation as the Detroit City Railway, with a corporate life of thirty years.

The company built the railways required in the ordinance of 1862, and continued to operate them until 1879. In the mean time two other railway companies, under ordinances of the city, built lines of road on certain streets, after the Detroit City Railway Company had declined to do so. They were known as the Detroit & Grand Trunk Junction Street Railway, and the Central Market, Cass Avenue & Third Street Railway. They became embarrassed, and their property and franchises were sold under mortgages, and new companies were organized to operate them. The successor of the former, the Congress & Baker Street Railway Company, was organized September 17, 1875, and the successor of the latter, the Cass Avenue Street-Railway Company, was organized August 18, 1877, each for 30 years. The ordinances under which these companies operated required them, in case the city paved or repaved the streets they occupied, to repave, at their own expense, all of the portion within the track, and two feet nine inches on either side thereof, and imposed a car license of $25 on each double horse car, and $12.50 on each single horse car, and a special tax for the second five years of the ordinance of 1 per cent. on the gross earnings, and after that of 3 per cent.

The city became dissatisfied with the taxes it was receiving in 1879, and, after negotiating between the three companies and the city, an ordinance was passed on November 24th of that year, the validity of which was the main controversy in this action. The first and second sections of the ordinance required certain extensions on the routes of the Detroit City Railway and the Detroit & Grand Trunk Junction Railway. Section 3 repealed the ordinances of June 13, 1873, and of June 16, 1875, granting authority to the Detroit & Grand Trunk Junction Street-Railway Company and to the Central Market, Cass Avenue & Third Street Railway Company to construct and operate street railways through certain streets of Detroit, and provided that the said railways, constructed and operated under those ordinances, should hereafter be subject to, and operated under, the ordinance approved November 24, 1862, and its amend-

ments, granting to the Detroit City Railway Company rights as therein set forth. The fourth section imposed a tax of 1 per cent., half-yearly, on the gross receipts of the companies, and required them to repave between the tracks when the city repaved, but not outside of the tracks, and stipulated that the tax and repaving should be in lieu of license and other taxes and charges for paving under existing ordinances. Section 5 provided that:

"The powers and privileges conferred and obligations imposed on the Detroit City Railway Company by the ordinance of November 24, 1862, and the amendments thereto, are hereby extended and limited to thirty years from this date."

The ordinance was to take effect on written acceptance of the railway companies. Such acceptances were filed by the Detroit City Railway Company, the Congress & Baker Street Railway Company, and the Cass Avenue Street Railway Company. In 1882 the two other companies conveyed all their property and franchises to the Detroit City Railway. In 1887, after an attempt by the city to collect additional taxes, upon a repeal by the legislature of a section in the incorporating act that had imposed on such railways a tax of half of 1 per cent. on the capital stock paid in, in lieu of all other taxes, a compromise was effected and embodied in an ordinance, confirming the ordinance of 1879, fixing the tax, in lieu of all other taxes by the city, at 1½ per cent. on gross earnings from 1882 until 1896, and 2 per cent. thereafter, and providing that the company should pay the same municipal taxes on all its lands and buildings as were imposed on individuals. The city thereafter attempted to collect, in addition to the taxes under the ordinance of 1887, taxes, under the general laws, upon the value of the tracks, horses, cars, machinery, and other personalty. In an action for the additional taxes the supreme court of Michigan gave judgment against the city, holding that the city was bound by the agreement as to taxes contained in the ordinance of 1887. City of Detroit v. Detroit City Ry. Co., 76 Mich. 421, 43 N. W. Rep. 447.

From 1880 to 1889 the city council, by several ordinances, gave authority to the Detroit City Railway to extend its lines under the ordinance of 1879; and much capital was invested in those extensions, and in repaving the streets, under the obligations of, and on the faith of, the validity of the ordinance, and the duration of its grant until 1909. In January, 1890, the Detroit City Railway transferred its property and franchises, by way of mortgage, to Miller and Muir, trustees, to secure bonds amounting to $1,000,000. In December, 1890, the Detroit City Railway Company transferred all its property and franchises to the Detroit Street-Railway Company, a corporation organized for 30 years from December 1, 1890. On September 16, 1891, the Detroit Street-Railway Company conveyed all its property and franchises to the Detroit Citizens' Street-Railway Company, a corporation organized September 2, 1891, for 30 years, and on the same day the Detroit Citizens' Street Railway Company conveyed the same property and franchises to the Washington Trust Company, of New York, in trust, to secure the payment

of $3,000,000 of bonds. On March 29, 1892, the common council passed an ordinance, which was approved by the mayor, repealing so much of the ordinance of 1879 as extended the rights of the Detroit City Railway in the streets until 1909, and shortly after this bill was filed.

Four questions arise in this case:

(1) Did the common council of Detroit, on the 14th of November, 1879, have power to extend the rights and privileges conferred by the ordinance of November 24, 1862, for 16 years beyond the life of the corporation upon which such right was conferred?

(2) Conceding the invalidity of the ordinance, are the parties in pari delicto, so that a court of equity will not lend its aid to the city, by mandatory and prohibitory injunction, to restore to it the rights it parted with by an ultra vires act?

(3) Is the former litigation between the Detroit City Railway Company and the city of Detroit, with reference to taxation under the ordinance of 1879, res adjudicata, so that thereby the city is estopped from denying the validity of the extension under that ordinance?

(4) Does the investment of capital on the faith of the validity of the ordinance granting such extension, and in discharge of the obligations of the street-railway company assumed as a consideration for such extension, estop the city from now seeking to annul the same?

1. The power of the city to grant the extension in the ordinance of 1879 is asserted by the defendants to exist under both the charter of the city, and also under the street-railway acts.

It may be well, in advance, to settle the rule which must govern the court in construing the statutes which are claimed to confer the powers of the city with reference to street-railway grants. In the first place, the street-railway laws are general statutes, affecting all street-railway corporations in the state. Clearly, therefore, the peculiar hardships which one construction will work to a particular company, because it may have expended large amounts of money on the faith of the correctness of another and different construction, cannot be permitted to affect the view which the court shall take. It might be otherwise if it were shown that such a construction prevailed generally in the state, and that money had everywhere been invested on the faith of it.

In the second place, the principle of construction with respect to the powers of municipal corporations was laid down by the supreme court of the United States in Minturn v. Larue, 23 How. 435, in the words of Mr. Justice Nelson, as follows:

"It is a well-settled rule of construction of grants by the legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public. This principle has been so often followed in the construction of corporate powers that we need not stop to refer to authorities."

See, also, Ottawa v. Carey, 108 U. S. 110, 2 Sup. Ct. Rep. 361, and Barnett v. Denison, 145 U. S. 135–139, 12 Sup. Ct. Rep. 819.

The contention of counsel for defendants seems to be that the rule above stated does not obtain in Michigan, because a local self-government, which has always existed in the state, and is preserved by the constitution of 1850, gives the cities inherent power independent of the legislature, which can only regulate the exercise of that power, but cannot take away or destroy it.

The constitution of Michigan provides, (article 15, § 13:)

"The legislature shall provide for the incorporation and organization of cities and villages, and shall restrict their powers of taxation, borrowing money, contracting debts, and lending their credit."

Article 4, § 38:

"The legislature may confer upon organized townships, incorporated cities and villages, and upon the board of supervisors of the several counties, such power of local legislative and administrative character as they may deem proper."

Article 4, § 23:

"The legislature shall not * * * vacate nor alter any road laid out by commissioners of highways, or any street in any city or village, or in any incorporated town plat."

It is quite clear from the foregoing that Michigan does not differ from other states in this: that a municipal corporation cannot exercise any power not authorized by legislative act. Michigan is, however, peculiar, in that its legislature cannot, by mandatory act or by state agents, control the administration of what are properly local affairs in cities, townships, and counties. When the legislature acts in such matters, it can only do so by conferring discretionary power upon the local corporations. In other words, the provisions of the constitution of Michigan, the peculiar effect of which has been so vigorously pressed upon the court by defendants' counsel, are merely restrictions upon the manner in which the legislature shall confer powers on municipalities, when it sees fit to do so. But the provisions do not, of themselves, create any power in the cities or other local municipal corporations. That is left to the legislature. No case cited from the Michigan Reports is in conflict with this view. See the opinion of Justice Cooley in the case of Board of Park Com'rs v. Common Council of Detroit, 28 Mich. 228. There is no reason, therefore, why the strict rule of construing the powers of municipal corporations should be departed from in Michigan. We have the highest authority for this conclusion. In the case of Taylor v. Railway Co., 80 Mich. 77, 45 N. W. Rep. 335, where the effect of a legislative grant of power to a city in reference to street railways was under consideration, Justice Grant, speaking for the supreme court of Michigan, said:

"Municipal corporations derive their sole source of power from legislative enactments. The rule has long been unquestionably established that municipal corporations are limited to those powers which are granted—First, in express words; second, necessarily incident to the powers expressly granted; and, third, those which are essential and indispensable to the declared objects and purposes of the corporation. 1 Dill. Mun. Corp. 89."

With the rule of construction thus established, we proceed to inquire what powers, if any, the city derives from its charter to authorize the laying of railways in the streets. It is important to

determine this, because, if the charter does not authorize the grant in question, then we must find the power asserted either within the four corners of the street-railway act, to be hereinafter considered, or not at all. Under the charter the city council of Detroit is given power "to establish, open, widen, extend, straighten, alter, vacate and abolish highways, streets, avenues," etc., within the city limits, and to grade, pave, repair, and otherwise improve the highways, streets, avenues, etc., "with stone, brick or other material," and "to prohibit the encumbering of the streets," and "to prescribe, control and regulate the manner in which the highways, streets, avenues," etc., "shall be used and enjoyed." Laws 1869, p. 1692, § 22, pars. 11, 13. The same provisions were in the revised charter of Detroit of 1857, (Laws 1857, p. 73,) and substantially similar authority was vested in the council under the charter of 1827 and its amendments, (2 Terr. Laws Mich. pp. 345, 346, §§ 18, 20; 3 Terr. Laws Mich. p. 938, § 2.) These powers are strictly legislative. What one council shall deem to be wise, and do, another council, in its wisdom, may undo. If one council shall open a street, another may vacate it. If one council shall improve a street with stone, another may tear up the stone, and put down brick. If one council ordains that wagons of a certain hundredweight, and with certain width of tire, may use certain streets, another council may determine that the tires must be wider, or the weight less. This is regulation of the use of the streets.

The supreme court of Michigan has decided that a street railway, whether the motive power be horse or electricity, is not an additional servitude of the street, which the abutting property holders can enjoin, if the railway has been authorized by the legislature and the city council. People v. Ft. Wayne & E. Ry. Co., 92 Mich. 522, 52 N. W. Rep. 1010; Dean v. Railway Co. (Mich.) 53 N. W. Rep. 396. It would seem to follow that under the general power to regulate the use of the streets the city council might permit or license a street-railway company, if it has the requisite franchise from the state, to lay its tracks in the streets and to run its cars thereon. But this would only be in the exercise by the council of legislative power. The same council, or a succeeding one, might, in its discretion, revoke the license. It must be so, because it is well established that in such subordinate legislative bodies it is not permitted to one to abridge the legislative power of its successors without express sanction of law. The first council permits a railway in a street because it is of opinion that such a use will best conduce to the public interest. When another council succeeds, it may conclude that the conditions have changed; that other, more important, traffic in the street is interrupted and blocked by street cars confined to one or two rigid tracks; and that it would serve the public interest as well to have the tracks laid in a parallel street. Under the exercise of its legislative power to regulate the use of the street, unless limited or abridged, the second council could require the removal of the tracks. The fact that, if permitted by the council, the continuance of the tracks and railway there would not be

an additional servitude, of which the abutting property owners could complain, has no bearing whatever on the discretion of council to refuse to permit the continuance of such use. It necessarily follows, having regard to the strict rule of construction already discussed, that while, under its legislative power of regulating the use of the street, council may permit a railway to be laid in the streets, it cannot, by virtue of that power, agree that such a use shall continue for 30 years. This is the exercise, not of a legislative, but of a contractual, power. It is an abridgment of the legislative power by contract. It is the grant of a vested right in the streets to the railway company, whereby, for 30 years, it shall have a private ownership in tracks in situ, and the exclusive right to run cars over them. Never, until street cars were adopted, was such an exclusive right in the surface of the streets permitted. The power to control the use of the streets had always been in municipalities, but it had never been exercised to grant such an easement.

But it is said that the investment required would render it impossible to build a street railway, if the right to continue its use were dependent on a revocable license. That may be true, and it is a good reason why one council should be given the right to abridge the legislative power of another by contract and grant; but it furnishes no ground for saying, in the absence of such legislative authority, that a right to legislate is a right to contract. A distinction should here be taken between the right of a city to permit the laying of gas pipes in the streets, and the laying of rails therein. The usual power conferred in a charter, with respect to lighting cities, is that the city shall have power to provide for the lighting of streets. Under this the city may do the lighting itself, or it may contract with a company to do it, and the implication would seem reasonable that it might, by contract with a gas company, secure to the company the right to lay its pipes in the streets, and keep them there for a number of years. It will be observed, however, that the usual power of the city, under its charter, is not to provide street railways. If it were, it would justify a very different implication from that founded on a mere legislative power to say how the streets shall be used. Another distinction is that the easement to be conferred in the case of a street railway is on the surface of the street, where public travel is, while the gas pipes are laid under the streets, and do not affect travel in the slightest degree. The ordinance in question attempts to confer the exclusive right to occupy the streets with a railway for 30 years. It is settled beyond controversy that such a right cannot exist, except by direct and express authority from the legislature. Jackson County Horse R. Co. v. Interstate Rapid Transit Ry. Co., 24 Fed. Rep. 306; Saginaw Gas-Light Co. v. City of Saginaw, 28 Fed. Rep. 529; Grand Rapids E. L. & P. Co. v. Grand Rapids E. E. L. & F. G. Co., 33 Fed. Rep. 659. But it may be justly said that the issue in this case does not involve the question whether the city can contract with one railway company that it will not permit another to occupy its streets, because, even if the grant of 1879

were void, so far as its exclusive character is concerned, it might still be valid to the extent of allowing the grantee to occupy the streets for the term of years, named, and this would require that the relief prayed for in the bill herein should be denied. The power of the city to increase the tracks in a street so as to interfere with travel is limited, (Grand Rapids St. Railways, 48 Mich. 433, 440, 12 N. W. Rep. 643;) and in many streets the laying of a double track, and its use, might practically exclude any other company. But only to this extent does the exclusiveness of the grant have any bearing on the question now under discussion.

The right of a city council, under its general control of the streets, to grant an irrevocable easement for the laying of tracks and running of cars, has several times been considered by courts of last resort in this country; and the great weight of authority is in favor of the view that such power does not include authority to convey a vested right in the streets for years, or in perpetuity. Judge Dillon, in his work on Municipal Corporations, used this language in section 724, (4th Ed.:)

"As respects ordinary railways operated by steam, and street railways operated by animal power, legislative authority is necessary, to warrant them to be placed in the streets or highways. The legislature may delegate to municipal or local bodies the right to grant or refuse such authority. The usual powers of a general nature in municipal corporations over streets are not sufficient to confer upon them the right to authorize the appropriation of streets by ordinary railroads which connect different towns, whose tracks are constructed in the usual manner,-and whose trains are propelled by steam. But it is otherwise as respects horse railways. They are for local travel, and the ordinary powers of municipal corporations are often ample enough, in the absence of express or other legislation on the subject, indicating a different intent, to authorize them to permit, or refuse to permit, the use of the streets within their limits for such purposes."

If in this, as is probable, the learned author is only referring to the fact that the use of the streets for street railway purposes is not an additional servitude, and may be licensed or permitted, in the discretion of the governing body of the city, under its legislative power of regulating the use of the streets, then he is sustained by all the authorities; but if he is to be understood as meaning that under such a power a city can irrevocably grant, for a term of years, to a street-railway company, an easement in the streets for its tracks and cars, the statement is in conflict with nearly all of the decided cases.

It is hardly probable that Judge Dillon's language is to be given the meaning claimed for it by counsel for the defendants, because in another section, in the same chapter, he emphatically approves the language of Judge Comstock in the case of Davis v. Mayor, etc., 14 N. Y. 506, expressly negativing the power of a city council having general control and regulation of the use of the streets to make an irrevocable grant of an easement therein to construct and operate a street railway. In Davis v. Mayor, etc., supra, and in Milhau v. Sharp, 27 N. Y. 611, the same resolution of the common council of the city of New York was under consideration. It purported to grant to Jacob Sharp and his associates the right to construct and

operate on Broadway, in the city of New York, a double-tracked street railway. It did not contain any stipulation by the city that it would not in the future grant similar rights in the same street to other persons. Two questions arose in the case: First, had the city the right to confer the power upon the grantees named in the resolution to maintain and operate a street railway, and collect tolls therefor? and, second, had the city council the right to convey an interest in the streets by contract? It was held by a majority of the court that, if the resolution were valid, it would confer a perpetual easement in the streets. Judge Comstock was of the opinion that the city had the right, by revocable license, under its general control of the streets, to permit a street railway to lay its tracks, and run its cars, but that it had no power, by contract or grant of a vested easement, to abridge its legislative control over the streets. Wright and Johnson, JJ., were of the opinion that, while the resolution was invalid as a contract, it was valid as a license revocable at pleasure, while the other five judges, including Denio and Comstock, held that the resolution was void for the reasons given by Comstock, J. In Milhau v. Sharp it was held (Judge Selden delivering the opinion) that the resolution was objectionable, both because it created a franchise which could only come from the state, and also because it involved the grant of an interest in the street, and a consequent abridgment of the future legislative power of the city to regulate the use of the streets. See, also, People v. Kerr, 27 N. Y. 188, and Coleman v. Railroad Co., 38 N. Y. 201. The effect of these cases cannot be explained away by the perpetual character of the grant therein contained.

They do and must rest on the principle that the power to make an irrevocable grant, either for years or forever, is not conferred on the city, under its general legislative power. This is apparent from the language of Mr. Justice Clifford in People's Passenger R. Co. v. Memphis City R. Co., 10 Wall. 38, where, after discussing the want of power in the municipal corporation to grant franchises for 25 years, he said:

"Such corporations are usually invested with the power to lay out, open, alter, repair, and amend streets within the corporate limits; but the rule is well settled that by virtue of those powers, without more, they cannot grant to an association of persons the right to construct, and maintain for a term of years, a railway in one of the streets of the municipality, for the transportation of passengers for private gain, and that resolution or ordinance of the authorities granting such a right is void."

Citing Milhau v. Sharp, 27 N. Y. 611; People v. Kerr, Id. 188; and other cases,—the learned justice continued:

"Special powers are given to such corporations to lay out, open, and repair streets, as a trust to be held and exercised for the benefit of the public, from time to time, as occasion may require; and the general rule is that those powers cannot be delegated to others, nor be effectually abridged, by any act of the municipal corporation, without the express authority of the legislature."

The same principle has been announced in State v. Trenton, 36 N. J. Law, 79; in Louisville City Ry. Co. v. Louisville, 8 Bush. 415, 421; in Covington St. Ry. Co. v. Covington, 9 Bush, 127; in Eichels

v. Evansville St. Ry. Co., 78 Ind. 261; in Denver & S. Ry. Co. v. Denver City Ry., 2 Colo. 673; Memphis City R. Co. v. Memphis, 4 Cold. 406; and in Nash v. Lowry, 37 Minn. 263, 33 N. W. Rep. 787; and Boston v. Richardson, 13 Allen, 146, 161.

The only cases brought to the attention of the court, in which a different doctrine has been announced, are Brown v. Duplessis, 14 I. Ann. 842, and State v. Corrigan Consolidated St. Ry. Co., 85 Mo. 274. In the first of these the supreme court of Louisiana held that a city might sell an easement in its streets to an individual for a term of 20 years, to construct, maintain, and operate a street railway, under its general power to regulate the use of its streets; but it should be said that there was a statute in Louisiana providing that no railroad, plankroad, or canal should be constructed through the streets of any incorporated town without the consent of the municipal council, and this was held by the court to imply the power by the council to give a consent in the nature of an easement. In State v. Corrigan Consolidated St. Ry. Co., 85 Mo. 263, the supreme court of Missouri held that, where a street railway was incorporated by special act for the purpose of constructing and operating a horse railway over the streets of Kansas City, the city had, under its general charter, power to open, grade, and improve its streets, the authority to grant to the street-railroad company the right to construct and operate a street railroad on the various streets of the city for the period of 20 years. Of the cases cited in the opinion, only Brown v. Duplessis, already referred to, supports the doctrine. Moreover, it is to be said, in regard to the Missouri case, that the special act authorizing the construction of a railroad in the streets of Kansas City gives the case a somewhat peculiar phase, for it might be strongly argued that the act conferred, by implication, upon the city, the power to consent to the railway's construction and operation, because the legislature would hardly, by special act, create a corporation to do that in a city which, under the laws of the state, the city would have no power to agree to.

The case of Atchison St. Ry. Co. v. Missouri Pac. Ry. Co., 31 Kan. 661, 3 Pac. Rep. 284, is relied on by defendants, but it by no means supports their claim. There the supreme court of Kansas held that a steam-railroad company could be enjoined from interfering with a street railway laid in the street of a city, which, without other power than that involved in the general control of the streets, had passed an ordinance purporting to give the proprietors of the railway an exclusive easement in the streets for a term of years. Justice Brewer put the decision on the ground that the railway was lawfully in the street under the license of the city, and expressly disclaimed a purpose to decide that a vested interest in the streets could be conferred by the city for years. See, also, Jackson County Horse R. Co. v. Interstate Rapid Transit Ry. Co., 24 Fed. Rep. 306. The question has never been expressly passed on by the supreme court of Michigan. In the case of Taylor v. Railway Co., 80 Mich. 77, 45 N. W. Rep. 335, however, the question was how far

the village of Bay City might, in its grant to a street railway of the right to use its streets, secure to the railway company as by contract the right to lay the track, without payment of damages to abutting property owners, and thus exempt the company from a liability to abutters for damages imposed by a charter given to the city subsequent to the railway grant. The power to create such exemption by contract was claimed under the general power of the city (then the village) of Bay City to lay out and establish, vacate, open, make, and alter such streets as it might deem necessary for the public convenience; and Justice Grant dismisses the claim with the significant remark, "No mention is made in the act of tram or street railways."

It follows from what has been said that the power to make the grant relied on by defendants in this case must be found in the tram or street railway acts, or not at all, and we may now proceed to examine that legislation:

The original tram-railway act of 1855 provided for the organization of companies to construct a railway from one town to another, not upon streets, but upon private property to be acquired by purchase or condemnation. The intention of the act, evidently, was that the tracks should be used by members of the public, with their own cars or carriages, upon payment of tolls fixed in the act. The motive power was limited to that of the horse or other animal. The corporators were required to file articles of association, stating, among other things, the duration of the corporation, which should not exceed 30 years. In 1861 additional sections were added, as follows:

"Sec. 33. It shall be competent for parties to organize companies under this act to construct and operate railways in and through the streets of any town or city in the state. Sec. 34. All such companies formed for such purposes shall have the exclusive right to use the same, provided, however, that no such company shall be authorized to construct a railway under this act through the streets of any town or city without the consent of the municipal authorities of said town or city, and under such regulations and upon such terms or conditions as said authorities may from time to time prescribe." Laws 1861, pp. 11, 12.

In 1867 the following additional proviso was added to section 34:

"Provided further, that after said consent shall have been given and accepted by the company or corporation to which the same is granted, such authorities shall make no regulations or conditions whereby the rights or franchises so granted shall be destroyed or unreasonably impaired, or such company or corporation be deprived of the right of constructing, maintaining and operating such railway in the street in such consent or grant named pursuant to the terms thereof." Laws 1867, p. 257.

The ordinance of 1879 was passed after the general street-railway act of 1867 was enacted, and the latter contained a provision that it should have application to all street railways organized previous to its passage. It is not contended that any change was made in the general act which would affect the operation of the above language; but section 13 of that act, which covers the same subject, may be quoted:

"Any street railway corporation organized under the provisions of this act, may, with the consent of the corporate authorities of any city or vil-

lage, given in and by an ordinance or ordinances duly enacted for that purpose, and under such rules, regulations and conditions as in and by such ordinance or ordinances shall be prescribed, construct, use, maintain and own a street railway for the transportation of passengers in and upon the lines of such streets and ways, in said city or village, as shall be designated and granted from time to time for that purpose, in the ordinance or ordinances granting such consent; but no such railway company shall construct any railway in the streets of any city or village until the company shall have accepted in writing the terms and conditions upon which they are permitted to use such streets, and any such company may extend, construct, use and maintain their road in and along the streets and highways of any township, adjacent to said city or village, upon such terms and conditions as may be agreed upon by the company and the township board of the township, which agreement and the acceptance by the company of the terms thereof, shall be recorded by the township clerk in the records of his township."

There has been much discussion at the bar concerning the character of the rights which the city, under the acts, confers upon the railway companies, in giving its consent as therein required. An examination of the briefs does not disclose any real difference between counsel upon this point. The franchise to construct and operate a street railway is conferred by the legislature upon any persons who organize as a corporation under the act, and file articles as required. The function of the city, under the act, is merely to consent, upon conditions, that the companies may exercise the state-given franchise in its streets. Similar statutes have been before other courts, and this is the view which has always been taken in respect to the city's function under them.

In Chicago City Ry. Co. v. People, 73 Ill. 541, where the construction of a similar statute was under consideration, the supreme court of Illinois said:

"It is a misconception of the law to suppose that the railroad company derived its power to construct a railroad from any ordinance of the city. All its authority is from the state, and is conferred by its charter. The city has delegated to it the power to say in what manner, and under what conditions, the company may exercise the franchise, conferred by the state, but nothing more."

And the same view is taken by the supreme court of Michigan in the case of People v. Mutual Gaslight Co., of Detroit, 38 Mich. 154; People v. Ft. Wayne & E. Ry. Co., 92 Mich. 522, 52 N. W. Rep. 1010; Sims v. Railroad Co., 37 Ohio St. 566; National Foundry & Pipe Works v. Oconto Water Co., 52 Fed. Rep. 29.

The first proviso of section 34, requiring the consent of the city, is a limitation upon the franchise to construct and operate, conferred in the granting section, No. 33. The office of a proviso is usually that of limitation. Minis v. U. S., 15 Pet. 423, 445. It here introduces a limitation in two ways: First, by making the franchise operative only on consent of the city; and, second, by allowing the city, in giving its consent, to surround the exercise of the franchise with such further limitations as it may choose to impose. As we have seen, no power exists in the city, outside of the railway acts, to grant a vested easement in the streets. The power to consent, which is indirectly conferred by the section 34, necessarily implies the power to grant the easement. But a power

implied must be limited to the necessity which gives rise to its implication.

An inevitable limitation thus arising is that the easement shall not endure beyond the life of the franchise for which the easement is given. I cannot escape the conclusion, which seems to me clear to a demonstration, that the power of consent to be exercised by the city under the statute is limited in time to the life of the franchise to be consented to. The acts of the state and city, together, in granting the franchise, and consenting to its exercise, are equivalent to the grant of a franchise by a state legislature, under a constitution which permits it, to a company to lay its railway in certain named streets of a city, and to operate the same, without the intervention of the city in the matter. Under a franchise of the kind supposed, such easement in the streets would pass to the grantee as would be necessary to the enjoyment of the franchise. Could it be claimed, in such a case, that the easement in the streets would outlast the franchise? Clearly not. Why, then, in this case, where the city's power to confer the easement only arises from the necessity for the enjoyment of the franchise, is it necessary to infer a power to confer an easement beyond the life of the franchise? Of course, there is this difference between the case just supposed and the conditions which may exist under the statutes here,—that the second grantor, i. e. the city, may impose additional conditions upon the exercise of the franchise, not contained in the original grant of the state, and so may cut off or reduce the time for which the franchise may be actually enjoyed to a time less than the life of the corporation; but, so far as relates to the maximum time of the easement, the supposed case clearly represents and illustrates limitations upon the combined acts of the state and city. The construction of the statute above stated does not require us to decide that the legislature could not give the city the power to confer on a street-railway company an easement in the streets beyond the life of its franchise. If the power existed, it would be a power in the city to delegate to one company the city's right to consent to a franchise of a second company, to be created by the state many years thereafter. If such a delegation may be authorized by an act of the legislature, certainly the power to make it cannot be inferred from a mere power to consent to the franchise of the first company.

The suggestion is made that the words of section 13 of the general railway act have a greater significance than section 34 of the tram-railway act, in that the city is therein to consent that the railway company shall construct, maintain, operate, and own its railway, and the argument is that the consent to ownership of the street railway implies that the easement may extend beyond the life of the franchise to construct and operate. I cannot see that the insertion of the word "own" changes in any way the meaning of the section. Consent to construct and operate certainly implies consent to ownership in the company, and the franchise to own a street railway, as such, conferred on the company,

does not endure any longer than its franchise to construct and operate it. After the death of the corporation, it owns nothing. It is the stockholders who own the assets, not by virtue of any franchise conferred by the state, but because, as individuals, they have that faculty and right.

It remains to inquire what is the life of the franchise conferred by the state upon a street-railway company under the acts of 1861 and 1867. The franchises of a street-railway company are of two kinds: First, the kind which every corporation—or, to speak more exactly and properly, its corporators—must have,—the franchise to be a corporation, and to act in its business, and for the purposes of its organization, as a natural person could act; and, second, the franchise to discharge a quasi public function for hire, i. e. to construct, maintain, and operate a street railway for the use of the public, and to collect tolls therefor. Franchises of the second class, which, for convenience, we may call noncorporate, are defined to be special privileges conferred by the government on individuals, and which do not belong to the citizens of the country generally, as of common right. Bank v. Earle, 13 Pet. 519. Such is the privilege to carry on any business in which the public have an interest, and from which the public may have service upon the payment of the usual fare or toll, as the maintenance of a ferry, a turnpike, or a railroad. People's Passenger R. Co. v. Memphis City R. Co., 10 Wall. 38. Franchises of this kind may be conferred on an individual, but, as a proper discharge of the quasi public duties generally requires much capital, it is the custom of the legislatures to confer them, directly, only on corporations. In the absence of an express provision in the charter to the contrary, noncorporate franchises conferred on a corporation last as long as the corporation is chartered to live, and no longer. If I comprehend the argument of counsel for the defendants, while they concede that the franchise to be a corporation cannot endure beyond the charter life, they maintain that when property has been acquired, for the enjoyment of which, a noncorporate franchise is necessary, the franchise becomes property, and is as indestructible and permanent as the property to which it is attached. Much of the argument is based on cases where such franchises and property have been assigned; and the view seems to be that, because the franchises are assignable, their length of life is independent of that of the corporation. The franchise to be a corporation is personal and cannot be assigned, but there is no objection to assigning noncorporate franchises. Property is required to enjoy franchises, and, when the property is assigned, the franchise to enjoy it, which is inseparable from it, goes with it to the assignee. Gue v. Tidewater Canal Co., 24 How. 257; Memphis & L. R. Co. v. Railroad Com'rs, 112 U. S. 609, 5 Sup. Ct. Rep. 299; Railway Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. Rep. 1009; Joy v. Plank-Road Co., 11 Mich. 155; McKee v. Railway Co., 41 Mich. 274, 1 N. W. Rep. 873, and 50 N. W. Rep. 469. But, while the property and franchises are inseparable, that can only be while the franchise

endures.    Though it is assignable, the franchise can only be assigned or enjoyed by the assignee as long as it is in existence. Speaking for the supreme court of Pennsylvania in Railroad Co. v. Casey, 26 Pa. St. 287, Judge Black said:

"The right to take tolls on a road is an incorporeal hereditament, which may be granted to a corporation or to an individual, and the grantee has an estate in the franchise.    But what an estate?    The estate endures forever, if the charter be perpetual; for years, if it be given for a limited time; and at will, if it be repealable at the pleasure of the legislature."

This opinion is cited as authority by Mr. Justice Miller in his opinion in the case of Greenwood v. Freight Co., 105 U. S. 13, where it was held that, under a reservation clause allowing the legislature to repeal any incorporation act at pleasure, the legislature might repeal the charter of a street-railway company, and destroy its franchise to run its railway in the streets of Boston. Speaking of the effect of the repealing act, Justice Miller said:

"If the essence of the grant of the charter be to operate a street railway and to use the streets of the city for that purpose, it can no longer so use the streets of the city, and no longer exercise the franchise of running a railroad in the city.    In short, whatever power is dependent solely on the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the state, is abrogated by the repeal of the law which granted these special rights.    Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not, in their nature, depend on the general powers conferred by the charter, are not destroyed by such a repeal; and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power.    The rights of the shareholders of such a corporation to their interest in its property are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights."

Again:

"The history of the reservation clause in acts of incorporation supports our proposition,—that whatever right, franchise, or power in the corporation depends for its existence upon the granting clauses of the charter, is lost by its repeal."

If this be true, a fortiori, is the franchise gone at the expiration of the express term for which the charter rights were granted?

It should be said that it is a mooted question whether, when a legislature exercises its right to repeal the charter of a corporation under the usual reservation clause, the repeal terminates those franchises of the corporation which are not corporate, and which are necessary to the enjoyment of property acquired by the corporation during its lawful existence.    The court of appeals of New York, in the case of People v. O'Brien, 111 N. Y. 1, 18 N. E. Rep. 692, has held that such a repeal does not take away the franchise to maintain and construct a street railway on a street of New York, the perpetual easement for which had been obtained from the city.    It seems difficult to reconcile this case with Greenwood v. Freight Co., supra, or with Railroad Co. v. Casey, supra.    Upon this point it is probable that the law of Michigan is more in accord with that of New York than with that of the cases just referred to, for in Detroit v. Detroit & H. P. R. Co.,

43 Mich. 140, 5 N. W. Rep. 275, the supreme court of Michigan decided that the power to alter, amend, or repeal the charter of a plank-road company did not permit the legislature to pass an act compelling the plank-road company to remove its tollgate beyond the municipal limits of Detroit, and give up the tolls of 2½ miles of its road, on the ground that the franchise to collect tolls for the use of the road was property, and therefore the act deprived the plank-road company of its property. But such a conclusion as that in People v. O'Brien, or that in Detroit v. Detroit & H. P. R. Co., has no bearing on the point we are discussing. It is only, in effect, a holding that the power of repeal reserved does not enable the legislature to reduce or destroy the value of the property of the corporation by arbitrarily taking away from its creditors and stockholders, during the charter term, the right to enjoy it in the way provided in the charter. But property acquired by a corporation is purchased for its enjoyment only during the charter life, and the necessary expiration of the franchise therein conferred is a fact entering into every investment of capital made by it, just as the improvements made by a lessee or life tenant must be made with the termination of his estate in view. The analogy is not quite accurate, because the lessee or life tenant loses his improvements, while the corporation only loses the value giving franchise, but its stockholders retain the rest of its property. Take the case of Detroit v. Detroit & H. P. R. Co., supra. The corporation was created for 60 years, with the right to construct a plank road and take tolls. The act of the legislature, the validity of which was attacked, was passed at the end of 30 years. Certainly, the supreme court of Michigan would not have held that when the 60 years of its life had expired the company might sell the road (if it had acquired it in fee) to another, and confer on that other the franchise to collect tolls. Yet this is the result involved in the contention of counsel for the defendants, that the attaching of franchises to property gives the former as much permanence as the latter.

The point under discussion is expressly decided by the supreme court of the United States in the case of Turnpike Co. v. Illinois, 96 U. S. 63. In that case a turnpike company was created a body corporate, to continue for 25 years, with power to construct and maintain a certain turnpike, erect the tollgates, and collect tolls. The state reserved the right to purchase the road at the expiration of the charter by paying the corporation the original cost of construction, but the road, and all its appendages, were to remain in possession of the company, subject to the rights and restrictions contained in the charter, until such time as the state should refund the cost. By a supplemental act passed in 1861, the company was authorized to extend its road, and, in consideration of its keeping in repair a certain bridge and dyke, to use them as part of the road, erect tollgates thereon, and collect tolls. When the 25 years, the term of the charter, had expired, in 1869, the legislature passed an act granting the city of East St. Louis the

exclusive control of the street upon the dyke. The act of 1869 was attacked, as impairing contract obligations. It was held that the franchise to collect tolls on the bridge and dyke, conferred by the supplemental act of 1861 was separate and distinct from that authorizing the collection of them on the original road, with its provision for continuance beyond the corporate life, and that the second franchise did not extend beyond the term of years for which the corporation had been created. Said Mr. Justice Bradley:

"No term was expressed for the enjoyment of this privilege, and no conditions were imposed for resuming or revoking it on the part of the state. It cannot be presumed that it was intended to be a perpetual grant, for the company itself had but a limited period of existence. At common law, a grant to a natural person without words of inheritance creates only an estate for the life of the grantee, for he can hold the property no longer than he himself exists. By analogy to this, a grant to a corporation aggregate, limited as to the duration of its existence, without words of perpetuity being annexed to the grant, would only create an estate for the life of the corporation. In the present case the turnpike company was created to continue a body corporate only for the term of twenty-five years from the date of its charter; and although, by necessary implication, a further continuance, with the special faculty of holding and using the turnpike authorized by the act until redeemed by the state, is given to it for that purpose, yet it is only by implication, arising from the necessity of the case, and therefore cannot be extended to other purposes and objects. Grants of franchises and special privileges are always to be construed most strongly against the donee, and in favor of the public."

The learned justice then said that if the company had constructed the bridge, and acquired a fee in the dyke or road, the case would have had a different aspect, for then the question would have been whether the state could take the property back without just compensation. These last remarks refer to the fact that the state had resumed possession of the bridge and road. If the turnpike company had built the bridge, and bought the land, and built the road, its property in them would not, of course, be destroyed by the determination of the franchise, and the public could not use them without paying just compensation. The franchise to collect tolls on them, however, would not have continued, and there is nothing in the language of the court which would justify such an inference.

It may therefore be assumed, with entire confidence, that when the state of Michigan granted, by virtue of its laws, to the Detroit City Railway Company, the franchise to construct and operate a street railway, it was limited to the life of the company, no matter to whom the franchise might be thereafter assigned, or to what property it might become attached. It necessarily follows that the power of the city to consent to the exercise of the franchise conferred upon the railway company was also limited in its duration to the life of the corporation. Either the limitation stated exists, or the power of the city is unlimited, and it may create in the streets, by virtue of the power to grant an easement, implied from these statutes, an estate in perpetuity. No other limitation can be found in the act than the life of the com-

pany to whom the consent is to be given. It is suggested that
the present grant, the validity of which is contested, was only
30 years, and as the city, unquestionably, had the right to con-
fer a grant of that duration on one company, it might upon another.
This ignores altogether the logical ground upon which the limita-
tion must be implied. The 30 years mentioned in the statute can
have no effect to limit the duration of the consent or easement
which the city confers, except by reason of the fact that this is the
time beyond which the life of the franchise and the corporation
cannot extend. This shows that the real limitation is not the 30
years, but it is the life of the corporation. It is suggested that
there is some time between the life of the corporation and a per-
petual grant, to be defined by the courts as a reasonable time
within which the grant can endure. I do not know any mode by
which such a limit can be fixed. In many of the states, grants
made are perpetual, and this where there are no words of perpe-
tuity, but merely words without limitation. In view of the fact
which appears in Booth on Railways, (section 17,) that, in some
10 or 12 states, grants of this kind have been made and sustained,
which are perpetual, it cannot be said that a perpetual grant
would be so unreasonable that the court might hold it void, if the
statute cannot be construed definitely to fix the duration of a
grant less than one in perpetuity. The attempt of the supreme
court of Iowa to determine what would be reasonable time for
the duration of an exclusive grant in the streets to a street railway,
in Des Moines St. Ry. Co. v. Des Moines B. G. St. Ry. Co., 73 Iowa,
513, 33 N. W. Rep. 610, and 35 N. W. Rep. 602, did not meet the ap-
proval of Justice Jackson in Grand Rapids E. L. & P. Co. v. Grand
Rapids E. E. L. & F. G. Co., 33 Fed. Rep. 659. See, also, Mr. Justice
Brown's opinion in Saginaw Gas-Light Co. v. Saginaw, 28 Fed. Rep.
529, and Richmond Gas-Light Co. v. Middleton, 59 N. Y. 228. As be-
tween a construction which will place a limitation on the grant, and
one which will give rise to a perpetuity, it is clear that it is the duty
of the court, in favor of the public, to impose the limitation. It
is true that what we are considering here is the power to make
the grant, and not the grant itself. But the same rule applies
in the construction of statutes conferring powers upon municipal
corporations to make such grants as in the construction of the
grants themselves. But even suppose that, where there was no
limitation, the courts might fix a reasonable limitation. Why is
it necessary for them to do so where there is a plainly-implied limita-
tion in this statute? Certainly, if that limitation is not unrea-
sonable, why seek another? It does not appear that it is unrea-
sonable.

Reference is made, to show the necessity for a longer grant than
the life of the corporation, to those sections of the street-railway
acts which give the company power, with the consent of the city,
to build new routes, and to extend its old lines. It is said that
it would seriously interfere with the probability that such new
routes would be built in the latter years of the corporation's life

if the estate of the railway company in the streets were limited to its life. It does not seem to me that this result should prevent what seems to be a reasonable construction of the statute. An express provision of law that the city council might confer an easement in the streets for 30 years, but that such easement should not be extended during its continuance, would hardly seem unreasonable. If one railway company will not build new routes and make extensions, the city would be able generally to secure the building of the new routes by grants to new corporations, and perhaps even to accomplish the same thing with reference to extensions. Neither the law nor public policy requires that one railway company shall furnish all the railway facilities in the city to the public. Nor does the provision for mortgaging the franchises and property of the company, with power in the purchasing company to use the property and exercise the franchises as the old company would have done, indicate a purpose on the part of the legislature to lengthen the time within which easements in the streets can be granted. The new company is to exercise exactly the same rights in the streets that the old company did under the statute and no more.

It by no means follows that, because under its general corporate powers the street-railway company might have the authority to receive an estate in the streets beyond its own life, the city has the power to confer such an estate. The usefulness of such a franchise to the company need not be denied. Its right to hold it need not be inquired into. The guide which the court must follow in construing the powers of the city is the interest of the public, and not the company, and only in so far as it is necessary to the exercise of the franchise can the power of the city be inferred to grant the easement. The cases which have been referred to as establishing the principle that the life of the corporation cannot interfere with its receiving an estate to endure thereafter have no application to the case at bar. The power of the city, or the owner of the estate to be granted, to convey, was in none of the cases the question. Thus, in the case of State v. Laclede Gaslight Co., 102 Mo. 472, 14 S. W. Rep. 974, and 15 S. W. Rep. 383, the question was whether a city ordinance granting to the Laclede Gaslight Company, its successors and assigns, the privilege of furnishing gas to the city and private consumers for a named period, was void because the term extended beyond the period of the existence of the company's charter. The ordinance provided that it might transfer all its rights, privileges, and franchises to any organized gas company of the state, which would, within 20 days after the transfer, file its written acceptance of the ordinance, and give bond to perform all the agreements required of the original company. The power of the city to make the contract was conferred in the charter to the St. Louis Gas Company by section 13 of the act of February 11, 1839, and is stated in City of St. Louis v. St. Louis Gaslight Co., 70 Mo. 98. The provision was that the corporation of the city of St. Louis and the directors of the St. Louis Gas Company might contract for, and

make regulations relating to, the lighting of the city with gas, in such manner as should be agreed upon, and they might make such contracts relating to the lighting of the city as might be beneficial to them and the public, and in the case last cited the court say:

"This section is broad and comprehensive in its terms, and authorized both plaintiffs and defendant's board of directors to contract with reference to the business of the company without limitation, they being left to the determination of the question whether such contract would be beneficial to themselves and the public."

There was no question of the power of the city in People v. O'Brien, 111 N. Y. 1, 18 N. E. Rep. 692. Reference is also made to New Orleans City & L. R. Co. v. New Orleans, 143 U. S. 192, 12 Sup. Ct. Rep. 406, where the question was one of taxation. It appears in the recital of facts, as reported by the supreme court, that defendant below had acquired all the real and personal property, right of way, and franchise for the privilege of running street cars, from another street-railway company, whose charter had expired; and it is said that this appeared to be no objection to the supreme court of the United States, and did not call for comment. In the report of the same case in 40 La. Ann. 587, 4 South. Rep. 512, this fact does not appear in the statement, and it is obvious, therefore, that no question was raised in either court on the point. Nor is it surprising, in view of the holding in Brown v. Duplessis, 14 La. Ann. 842, that the city, under its general power of regulating the use of the streets, might sell an easement in them for a railway, to an individual, for 20 years, without his having secured a state franchise. The case shows that in Louisiana the city can grant the franchise without the state's acting at all; so that, of course, there is no necessary connection between the life of the corporation created by the state, and a franchise which the city has a right to confer on an individual without limitation. This fully explains the rulings of the United States supreme court in New Orleans City & L. R. Co. v. New Orleans, supra, and Railroad Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. Rep. 1009, if indeed, they involve the point claimed by defendants' counsel, which is by no means clear, because there is no discussion or consideration of it in either case.

Another argument made against limiting the city's power of consent to the life of the corporation is the practice which is said to have prevailed all over Michigan, of making grants in the streets beyond the life of the corporation grantee. Sixteen instances have been submitted. This is not a large number, considering the number of such corporations of the kind in question which there must be in the state. Of the grants submitted, half were made in 1890, or since, and the rest were scattered along between 1880 and 1890. While the practical construction of a doubtful statute, by those who are required to construe it in order to execute it, is often persuasive with the courts, such construction, to be controlling, must have been uniform, long continued, and generally acquiesced in. Neither requirement is complied with here. Some

councils seem to have thought that the legal limit on grants was 30 years, and some have made grants perpetual. The great weakness of the argument on this ground, however, is in the fact that in no instance submitted has the first grant expired. Until such expiration the question of the validity of the extension would not be raised, and there could hardly be said to be acquiescence therein by the public, or others interested to question it.

It is insisted that the necessary result of this limitation upon the right of the city to consent to the construction and maintenance of a street railway is that the easement conveyed by the city would end upon the premature dissolution of the corporation under the repealing clause, or by judicial forfeiture, as well as upon its death by normal expiration of the charter term. Even if this result does follow, it is not the reductio ad absurdum. Whether this is the result or not depends on the effect to be given to the repealing clause, or the judicial forfeiture. If either can take away the property rights in a franchise, then the question would still remain, whether the easement of the railway company might not endure for the normal life of the franchise, inasmuch as it was not granted by the state, but by the city, for that normal life. Whatever the conclusion upon this point, it would not, in any way, as it seems to me, show that the power of the city is not to be limited by the normal life of the franchise and the corporation. Under the decision in Detroit v. Detroit & H. P. R. Co., 43 Mich. 140, 5 N. W. Rep. 275, it is probable that premature dissolution would not prematurely destroy the noncorporate franchises, when attached to the easement conferred by the city, and that they might both endure until the normal expiration of the franchise.

Another argument against the conclusion arrived at, as to the city's power, is the supposed anomaly that the grant of 1879 to the City Railway Company for an extension of its easement in the streets beyond its life should be invalid, when, if the stockholders of the City Railway Company had caused a transfer of its property and franchises to a new company, and then had procured the grant of 1879 to the new company, its validity would have been beyond dispute. The anomaly, if there be one, arises from the law which courts are not permitted to ignore, that one corporation is a different entity from another, and from the limitation upon the lives of corporations, which seems to be the peculiar policy of the state of Michigan. Section 10, art. 15, of the state constitution provides that no corporation, except for municipal purposes, or for the construction of railroads, plank roads, and canals, shall be created for a longer period than 30 years. It has been the subject of some argument at the bar as to whether street railways come within the inhibition, or within its exception. I am inclined to think, considering the fact that street railways were not known at the time the constitution was adopted, that they are not properly included within the exception, and that they are within the inhibition of the constitutional provision. This view is borne out by the construction which the legislature has put upon this section in its

provision for the corporate life of street railways. The street railways, as has already been stated, were organized first under the tram-railway act, which provided for locomotion by horse power only, and they were limited in life to 30 years. Railroads, however,—that is, commercial railroads,—plank-road corporations, and canals have not been limited in duration by the legislature. Street-railway corporations, organized under both the tram-railway act and the general railway law, have always been limited to 30 years. This would seem to be a construction by the legislature of this section, and a recognition that the street railway was not properly a railroad, within the view of the framers of the constitution. But it is really immaterial, for the discussion here, whether it is or not. The life of street-railway companies is limited by the incorporating act to 30 years, and it is to be inferred that the reason for the limitation is the same as that which induced the constitutional convention, and the people who adopted its work, to impose a limitation on corporate life in the constitution. Now, the reason for this constitutional limitation has been explained by the supreme court of Michigan in the case of Agricultural Soc. v. Houseman, 81 Mich. 610, 46 N. W. Rep. 15, where the court said:

"The evident intent of this section was to prevent the perpetuation of corporate power and corporate life, so as to place it practically beyond the reach of the people or the legislature. It was intended to apply to corporations of a private character, organized for profit and the accumulation of wealth, and not to those which are public in their character, and designed solely for the purposes of education and improvement."

In the case of Mason v. Perkins, 73 Mich. 303, 41 N. W. Rep. 426, where the question was as to the validity of an act of the legislature of Michigan authorizing mining and manufacturing companies to renew their corporate existence for 30 years, the court, in an opinion denying the power of the legislature to pass such an act, said:

"Is not such a mandate a direct and positive limitation on the power of the legislature to extend the time, or renew the corporate existence, beyond that term? What consequences are expected to follow upon the expiration of such limitation? Naturally, the corporation becomes dissolved, and incapable longer of exercising corporate functions in pursuing and carrying on its business. Its business is to be closed out, its obligation paid, and the assets distributed among its stockholders. * * * The design of the framers of the constitution was to put all purely private corporations on the same footing, and to fix a limit of time, beyond which they should not continue to exist."

It is sufficiently apparent from this, and from the constitutional limitation itself, that the limitation upon the corporate life was not a mere formality, but it was intended to interfere with the perpetuation of corporate wealth and power. In the light of this state policy, it would hardly be proper for a court to be swayed from a conclusion as to the meaning of a statute by the claim that it involves an anomaly, when the anomaly has no existence, except in the view that a corporation may in fact perpetuate its wealth and franchises, and remain identically the same entity, no matter how many different names it bears, or how many formal convey-

ances of property and franchises are necessary to continue its existence. I am of opinion, for the reasons given, that it was not within the power of the common council of Detroit, on November 14, 1879, to confer upon the Detroit City Railway the right to occupy the streets with a railway 16 years beyond its corporate life.

The discussion, thus far, has related to those grants in the streets which were made by the city to the Detroit City Railway. All of them must be held to expire on the 9th of May, 1893. But the grants to the Detroit & Grand Trunk Junction Railway Company, and to the Central Market, Cass Avenue & Third Street Railway Company, even if the ordinance of 1879 had not been passed, would not have expired until 1903 and 1905, respectively. When the ordinance of 1879 was passed, those grants were owned by the Congress & Baker Street Railway Company and the Cass Avenue Street-Railway Company, whose charters did not expire until 1905 and 1907, respectively. The extension of 1879, with respect to these grants, would be valid until those dates, if the owners chose to rely on the ordinance as binding on the city pro tanto. Whether, therefore, the ordinance of 1879 is to be wholly annulled, or to be given effect as far as may be, the grants referred to do not terminate May 9, 1893. It cannot affect this result that the franchise and easement lawfully enduring until 1905 and 1907 were, after they came into existence, held for a time by the Detroit City Railway Company. Whether that company had the power to take such property, and enjoy it, or not, its actual ownership and enjoyment of it could not forfeit and destroy the existence and continuance of the inseparable easement and franchise during the life of the first grantee of the franchise. The Detroit Citizens' Street-Railway Company is in possession of these easements and franchises, and we are not here to determine the legality of the mode by which it acquired title, in the absence of the original grantees of those easements and franchises, who, so far as appears, fully acquiesce in its ownership of them. I say this much to show that we do not need now to consider, and do not decide, the question whether the Detroit City Railway had the statutory capacity to receive from another company that company's franchise and easement, enduring beyond the life of the Detroit City Railway. With respect to the Congress & Baker Street grant and the Cass Avenue grant, the relief prayed for by the complainant must be denied.

I have reached the conclusion above stated as to the meaning of the street-railway laws of Michigan only after giving this case the study and investigation which the large amount involved in the issue, and my want of familiarity with the Michigan law, have necessarily required. The fact that my Brother Swan, with his legal acumen, long training, and intimate knowledge of the Michigan law, differs with me, gives me much concern, lest I have reached a wrong result. Nevertheless I cannot reconcile any other result to the rules of construction which it seems to me must govern

in the case; and it is my duty, therefore, to adhere to the position as stated.

2. It is contended on behalf of the defendants that, even if the ordinance of 1879 is invalid, a court of equity will not assist the city, by affirmative relief, to avoid or annul it, or to restore the streets to its possession, which it parted with in performance of the invalid contract.

In St. Louis R. Co. v. Terre Haute R. Co., 145 U. S. 393, 12 Sup. Ct. Rep. 953, the supreme court decided that when a corporation appeals to a court of equity to rescind a contract which is ultra vires, and to be restored to rights parted with under it, the court should refuse to grant any relief, because both parties to the contract made in violation of law are in pari delicto, and should be left where the court finds them. The cases cited, and others like it, do not, however, apply to the case at bar. The defendant is now occupying the streets of Detroit. It has no right to be there, except by a lawful grant of the city. The city council, in its legislative capacity, passed the ordinance of March 29, 1892, fixing the time beyond which the company could not remain in the streets. The question here is whether the ordinance of 1892 is valid, as an exercise of the council's legislative power over the streets. We have found that the ordinance purporting to make a grant beyond May 9, 1893, was invalid. It was therefore within the power of the city council to pass the ordinance of March 29, 1892, and by virtue of its terms the company will unlawfully occupy the streets after May 9, 1893. The city does not need to have the ordinance of 1879 rescinded by a court of equity. The city has already rescinded it by the ordinance of 1892. The continuance of the street-railway tracks in the streets, without the authority of the city, will become a public nuisance, which the city may ask a court of equity to remove by the power of injunction. Bay Co. v. Bradley, 39 Mich. 163. The case of the city is different from that of a private corporation. The city council, for the time being, is the trustee, in control of the streets for the benefit of the public; and, although former trustees may have attempted to do that which they had no power to do, the public cannot be prevented from having asserted in its favor the ordinary equitable remedies to maintain its rights in the streets.

3. The answers plead that the city is estopped in this case to maintain that the extension clauses of the ordinance of 1879 are invalid, because in a previous litigation between the city and the Detroit City Railway Company the validity of the ordinance in question was involved and a judgment was rendered against the city on that issue by the supreme court of the state of Michigan. The litigation referred to was an attempt by the city to collect taxes from the Detroit City Railway Company beyond the limits fixed in the ordinance of 1879 and the ordinance of 1887. The street-railway company relied on the contract provisions of the ordinance with reference to the amount of taxes which the city should collect, and the city contended that those clauses did not,

and could not, limit its right to impose taxes under the laws of the state. The supreme court held that it was within the power of the city to stipulate what taxes the street railway should pay for the enjoyment of its easement in the streets, and to bind itself as by a contract. The validity of that clause in the ordinance of 1879, which extended the privileges and obligations of the ordinance of 1862 beyond May 9, 1893, was not, however, involved in the case. As against the city, the ordinance would be binding until May 9, 1893, and it would not lie in its mouth to say that the taxation clauses were invalidated because it had not the power to do all it stipulated to do with reference to the extension of the easement beyond 1893. Had the city been seeking to enforce some of he stipulations contained in the ordinance against the railway company, it would doubtless have been a good defense for the company to have set up the invalidity of the extension beyond May 9, 1893, but such invalidity, if waived, or not questioned, by the company, would furnish no ground for the city to disregard its other obligations under the contract. It was not necessary, therefore, for the supreme court, in deciding the case referred to, of City of Detroit v. Detroit City Ry. Co., 76 Mich. 421, 43 N. W. Rep. 447, to pass upon, or consider, the validity of that clause of the ordinance of 1879 which is here in question; and its judgment in that case cannot, by any possibility, be res adjudicata here. Jacobson v. Miller, 41 Mich. 90, 1 N. W. Rep. 1013; Cromwell v. County of Sac, 94 U. S. 351.

4. We come now to a defense which certainly appeals to a chancellor. The answer sets out with much particularity the extensions and the expenditures which the Detroit City Railway made upon the faith that the grant of the easement in the streets beyond its corporate life, until 1909, was valid. It appears from a comparison of the ordinance of 1862 with that of 1879 that the Detroit City Railway assumed much heavier obligations under the new ordinance than it had under the old, with respect to paving between tracks and paying taxes. Until within the last two years, no one, on the part of the city, has questioned the validity of the extension which we have found to be invalid. Large sums of money have been expended on the faith of it. Obligations have been enforced by the city against the street-railway company, which derived their binding character only from the ordinance of 1879. Were the city an individual, its conduct, in now seeking to escape, for want of power, its obligations solemnly entered into, and for more than a decade quietly acquiesced in, might justly be said to be wanting in good faith. Were the case one in which money had been given to the city, or where work had been done upon property which the city held, it might be possible for the court to give the defendant company relief, by requiring the city to disgorge that which it had illegally taken, by giving a money judgment against it, for money and property had and received. Hitchcock v. Galveston, 96 U. S. 341. But it is impossible, in this case, to apply such a remedy. The investments of the street-rail-

way company were not given to the city. They were investments of private funds in private property, for private purposes, to subserve the public interest, on the faith of the supposed permanence of the investment. Those who made the investment knew, or ought to have known, the statutory powers under which the city council acted, and if I am right in the conclusions already stated with reference to those powers, ought, in the necessary theory of the law, to have known that they were investing on the faith of a grant which would last only to May 9, 1893. Where full knowledge of the powers of a corporation are had by the person dealing with it, he cannot plead estoppel by reason of a mistake of law, to avoid the claim of ultra vires. This is especially true in cases where the corporation is a municipal corporation, and is exercising powers in trust for the public. Rens v. City of Grand Rapids, 73 Mich. 237, 247, 41 N. W. Rep. 263; Bogart v. Lamotte Tp., 79 Mich. 294, 44 N. W. Rep. 612; Spitzer v. Village of Blanchard, 82 Mich. 234, 46 N. W. Rep. 400. I am of the opinion, therefore, that the plea of estoppel is no defense in favor of the Detroit City Railway, upon whom, as we have found, the city council had no power to confer the grant to occupy the streets beyond May 9, 1893.

In the consideration of the plea of estoppel, however, a different question from the one just considered is presented by the transfer, in December, 1890, of all the property and franchises of the Detroit City Railway Company to the Detroit Street-Railway Company, and later by the Detroit Street-Railway Company to the Detroit Citizens' Street-Railway Company. The two latter companies had lives and franchises from the state, enduring until 1920, and there was no want of power in the city or city council to make a grant to either of them until 1909, like that now claimed by them under the ordinance of 1879. If the city, after these two companies have had possession of the streets, has recognized the ordinance of 1879 as valid, by enforcing obligations against them under it, which could not be enforced under the ordinance of 1862, and which these companies discharged on the faith of the 1909 extension, and in doing so expended much money, the question presented is whether the city is not estopped, as against them, to deny that it has confirmed in pais the void grant to the Detroit City Railway Company, and made it a valid grant directly to them. The averments of the answer upon this point are as follows:

"That, under the provisions of the various ordinances and grants heretofore referred to, the several street railways to which such grants were made were required to, and did, pave, repave, and repair, and keep clean, portions of the streets between and adjacent to their tracks, and in so doing expended large sums of money for permanent improvements on the streets so occupied by them. That, during the years 1890 and 1891, some of said companies, their successors and assigns, were required to alter the grading of the streets, and to relay, at great expense and labor, many miles of the track, and since January 3, 1889, have constructed many miles of track on new lines, and extensions of old ones, all of which they did with the full knowledge and understanding of the city of Detroit, and solely by reason of its admission and agreement that the rights, privileges, extensions of time, contained and made in and by the ordinance aforesaid, adopted November 14, 1879, were

valid and binding and enforceable on said city, as well as on said company. That in the year 1890 the said city of Detroit repaved Jefferson avenue from Mt. Elliott avenue to Woodward avenue, and the said Detroit City Railway Company was thereby required to, and did, rebuild its entire track on said Jefferson avenue, and change the grade thereof, and did pave between its tracks, making a permanent improvement, which would last for many years. That during the year 1891 many other extensive permanent improvements were made by said Detroit City Railway Company, its successors and assigns, involving the outlay of large sums of money, solely by reason of the understanding between the said city and the said company, and of the admission and agreement of said city of Detroit that the rights of said company, their successors and assigns, under the ordinance of November 14, 1879, extended until November 14, 1909. And this defendant avers that the said city of Detroit, by reason of the matters herein set forth, is estopped from claiming that said ordinance of November 14, 1879, is invalid, and from taking any advantage of the invalidity of said ordinance, should this court, for any reason, in any proceeding before it, hold the same to be void and ineffectual."

My impression is that upon the foregoing averments, though they are not very clear in distinguishing between the acts of the new and of the old company, the question suggested above is presented. The decision of the question is by no means free from difficulty. Because of the then more important questions, it was not argued at the bar. As it has, in my view of the other questions, assumed an importance, in deciding the case, not before given to it by counsel, I do not think it should be disposed of without full argument. More than this, the magnitude of the interest of both parties to this cause is such that all doubt or ambiguity in regard to the exact facts upon the point should be removed by amendment. The facts can hardly be the subject of much dispute between the parties, because many or all of them must be capable of record proof, and it is hoped the parties can agree upon them. The order of the court, therefore, will be for a further argument of the point stated, with leave to the defendants, within 10 days from the filing of this opinion, to amend their answers to more distinctly disclose the facts upon the point. If complainant cannot accept defendants' statement of facts in the amendment, a replication may be filed, and evidence taken, as in other cases.

SWAN, District Judge, (dissenting.) The opinion of the circuit judge, in my judgment, in its reasoning and conclusions, is so utterly subversive of the principles of equity that I am unwilling, by my silence, to sanction an apparent assent to what seems to me to be a most inequitable result. The bill sets forth, in substance, the original street-railway ordinance of November 24, 1862, the incorporation of the Detroit City Railway Company for 30 years under the tram-railway act, the passage of the ordinance of November 14, 1879; and reciting that the railroad company insists on the right, under that ordinance, to operate its railways until 1909, as the basis of the interference of a court of equity, it then alleges that:

"Said ordinance of November 14, 1879, so far as it purports to extend the rights of the Detroit City Railway, and enlarge the powers and privileges theretofore conferred upon it by said common council beyond the 9th of May,

1893, was wholly invalid, and not within the power or authority of the common council of said city to grant or confer upon said railway company, and that the legislature has never given the power to said common council to grant such privileges to said company, extending beyond its corporate life, and that the constitution prohibits granting such a privilege."

The only equity it pleads is contained in its eighteenth and nineteenth paragraphs:

"(18) The right or privilege of maintaining and operating street railways on the streets above mentioned, on which said City Railway Company constructed its lines of railway, is of great value; and if your orator was now free to enter into a contract with a company or companies, whereby it might grant such right or privilege to such company or companies, unembarrassed by claims or threats of the said defendants, and especially of said Detroit Citizens' Street Railway, your orator might dispose of said right or privilege for a large sum of money, amounting at least to the sum of $1,000,000. (19) * * * The common council of said city desired to negotiate for, and if possible to enter into, agreements with a company or companies who may construct and operate street railways on said streets; but your orator cannot, by reason of said claims and threats of said defendants, successfully negotiate or enter into contracts on favorable terms with any company or companies until the rights of your orator and the defendants hereto are determined, with respect to the time when the privileges granted to the Detroit City Railway expire."

The relief prayed is—

"That all rights and privileges under an ordinance of said city passed November 24, 1862, granting to the Detroit Street Railway the right to construct, maintain, and operate lines of street railway in any of the streets of the city, or under the ordinance amendatory thereof, or supplementary thereto, terminate on the 9th day of May, 1893, and that the right of the city to the control of the streets, and to the granting by it of all rights and privileges of constructing and operating street railways thereon, may be determined, and that the defendants, or any of them, maintaining or operating street railways in said streets, be compelled, by mandatory injunction or decree, to vacate the same, and remove their tracks, immediately after said date, and be perpetually enjoined from maintaining or operating said railways on said streets after said date, except by permission of complainant, and for other and further relief."

There is no offer in the bill to reimburse or compensate the street-railway companies, or either of them, in whole or part, for the expenditures made by them, or to return the moneys, or any part of the moneys, exacted by the city from the companies by way of taxes in excess of the license fees to which, under the ordinance of 1862, the city was limited, nor is it denied that these expenditures were made, and taxes exacted, in consideration of, and reliance upon, the validity of the ordinance of 1879, and the good faith of the city. Neither is it contended that the street-railway companies, or either of them, have in any particular violated the terms upon which the said city granted the use of the streets for the operation of their railways, or that in the use and enjoyment of which grant the public easement or travel is in any way obstructed or impaired, nor that they have failed in any circumstance or degree to meet the needs, or even the demands, of the public for cheap and rapid transportation. Neither is there any pretense that the complainant was inveigled into granting this easement by fraud, or that the consideration for which it was granted was inadequate. The entire claim and theory of the bill is rested

on the propositions (1) that the city had no power to grant an easement extending beyond the life of the corporation, and therefore the ordinance of November 14, 1879, is void: and (2) that a court of equity has jurisdiction to rescind the grant, decree the right of the grantee terminated, remove the tracks of the defendant from its streets, to the end that the city may make a new and better bargain for their use.

It is conceded that, if the grant in question had been made to a corporation composed of the same individuals, its validity would be unimpeachable in law, as well as in equity.

Accepting, as we must, the truth of all the facts pleaded in the answer, the cause having been heard on bill and answer, there can be no doubt that, had the complainant's bill set forth these facts, a demurrer to the bill for want of equity would have raised every question material to the decision of the case. In my view of the admitted facts, therefore, the court is not, in the first instance, concerned with the construction to be given to the powers of the municipality, nor to inquire whether or not it has, in this case, exceeded the strict legal limits of those powers. In what I have to say, I accept as undeniable the statement of the law as to the powers of such corporations as laid down by Dillon on Municipal Corporations, (section 89,) and approved by Judge Grant in Taylor v. Railway Co., 80 Mich. 82, 45 N. W. Rep. 335, that:

"Municipal corporations derive their sole sources of power from legislative enactment. The rule has been long and unquestionably established that municipal corporations are limited to those powers which are granted—First, in express words; second, necessarily incident to the powers expressly granted; third, those which are essential and indispensable to the declared objects and purposes of the corporation."

I accept also the rule of construction of legislative grants to corporations, public and private, enunciated in Minturn v. Larue, 23 How. 436—

"That only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the objects of the grant. Any ambiguity or doubt arising out of the terms used by the legislature must be resolved in favor of the public."

Whether or not the city, under this rule of construction of its charter and the statute of 1855, under which it acted, proceeded ultra vires, to such an extent as to make its ordinance a mere usurpation of power, is a subordinate question, upon which, I am frank to say, I entirely dissent from the opinion of the circuit judge.

The first and main question is: (1) Does the case made entitle the complainant to the relief prayed in the bill? And the second question, of almost equal importance, is: (2) Conceding that the city exceeded its powers in granting to the railway company an easement in its streets for 30 years from November 14, 1879, will a court of equity aid complainant, upon the facts evidenced by the bill and answer?

Does the case made entitle complainant to the relief prayed in the bill?

1. This is nominally a suit for equitable relief, and the effect of the mandatory injunction asked, if granted, will be to practically forfeit and sequester, under the forms of law, and in disregard of deliberate and repeated assurances and contracts of the complainant, under which it and the defendants have acted, the property rights and privileges, of immense value, owned by the principal defendants, and also the valuable dependent property and securities of their mortgages, all of which were confessedly acquired in good faith, and for valuable considerations, and which the complainant still holds, without tendering compensation to the railway companies for their expenditures and investments, amounting to millions of dollars, or offering to return any part of the consideration received by it in taxes and otherwise, aggregating nearly $100,000 more, under the very ordinance, and only by virtue of that ordinance, which it now asks the court of equity to declare null and void,—an ordinance under which the complainant has acted for 14 years, and expressly authorized, and in some cases even required, investments, and exacted the taxes thereon. Assuming that the city had transgressed its powers in making the grant in question and that a court of law, were this case within its cognizance, would be compelled to so adjudge, under the rigid rules which control its decisions, is it possible, under the admitted facts of this case, that a court of equity will shut its eyes to the iniquity of the demands of the complainant? The question should carry its own answer. It is a familiar maxim of equity jurisprudence that "nothing can call forth a court of equity into activity but conscience, good faith, and reasonable diligence." Another maxim is that "he who seeks equity must do, or offer to do, equity." The relief prayed calls for the exercise of one of the highest powers of a court of equity, aptly termed in Irwin v. Dixion, 9 How. 33, "the extraordinary or transcendent power of injunction, and is therefore to be used sparingly, and only in a clear and plain case," and of which it is well said in Bonaparte v. Railroad, Baldw. 217, 218:

"There is no power, the exercise of which is more delicate, requires greater caution, deliberation, and sound discretion, or more dangerous, in a doubtful case. * * * It is the strong arm of equity, that never ought to be extended, unless to cases of great injury, when courts of law cannot confer an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protective, preventive process of injunction; but that will not be awarded in doubtful cases, or new ones not coming within well-established principles, for if it issues erroneously an irreparable injury is inflicted, for which there can be no redress; it being the act of a court, not of a party who prays for it. It will be refused till the courts are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done, by an illegal act."

Whether this bill is to be regarded as one for the cancellation of the contract of November 14, 1879, and a bill quia timet, or as invoking equitable interference against a nuisance, the principles mentioned, reinforced, as is their application, by the avowed objects of the bill, its utter lack of allegation or averment of any fact, matter, or thing necessitating equitable interference, and the con-

ceded facts, in the face of which we are asked to interfere, are fatal to the maintenance of this suit. If it can be taken as a bill for the cancellation of the contract made by the ordinance of November 14, 1879, it is a call for the exercise of the highest chancery power,—a power most frequently exerted in cases of fraud, accident, or mistake, which ought never to be exercised except in a clear case. Atlantic Delaine Co. v. James, 94 U. S. 214; Marble Co. v. Ripley, 10 Wall. 354. In the last case a corporation had bought lands charged by a covenant inseparable from the deed by which the land was originally conveyed, and which was part of the consideration of a contract made with the vendor. The company, retaining the deed, sought to have the contract rescinded and canceled on the ground that one Ripley, through whom they derived title, had not performed the duties which the contract imposed on him; that though it was, when made, intended to operate for the equal benefit of both parties, it had become, in the progress of time, oppressive and burdensome to complainants, or, as they denominated it, unconscionable; that it made them partners with the original grantor and his successors, whether they will or not, and that, if corporations cannot enter into partnership, they cannot purchase lands subject to the obligation of the coming partners, and therefore the contract restrained the alienability of the property. The court said, inter alia:

"The agreement is inseparable from the deed for the land. They were made at the same time, and they are parts of one arrangement. What is asked, therefore, is not to rescind the entire contract, but to strike out a part which has become onerous to one of the parties. It is clear that the rights secured to Ripley by the agreement were a part of the consideration for his grant in the land, and so it was understood at the time his deed was made. But the deed was an executed contract; it conveyed the title to the grantee; and if, therefore, the agreement is rescinded by decree of the court, the consideration is taken from the vendor after his conveyance has taken effect, and yet his grant is in force. It is believed that such action by a court of equity is quite unprecedented. It has been ruled that, when a party seeking to set aside a conveyance made by him has received part of the consideration, he must return it before a court of equity will cancel the conveyance. * * * Nor is it any reason for rescinding the contract that it has become more burdensome in its operation upon the complainants than was anticipated. If it be, indeed, unequal now,—that is, be unconscionable, —that might possibly be a reason why a court should refuse to decree its specific performance, but it has nothing to do with the question whether it shall be ordered to be canceled. It is not the province of a court of equity to undo a bargain because it is hard."

See, also, Putnam v. Grand Rapids, 58 Mich. 419, 25 N. W. Rep. Rep. 330, which expressly applies this doctrine to the contracts of municipal corporations.

The avowed object of this bill—its only purpose—is to obtain the aid of a court of equity to repudiate the complainant's contract on the ground that, if freed from it, complainant might dispose of such right or privilege for a large sum of money, amounting at least to the sum of $1,000,000. If a more absurd and unconscionable pretense for invoking its plenary jurisdiction was ever presented to a court of equity, the case has not been cited. There is neither pretense nor allegation that the contract, when

entered into, was unreasonably hard or unfair; or that either party so regarded it, or even now avers it has that character; but the right to this extraordinary relief is based wholly upon the proposition, not that the contract was prohibited by law, but that the authority to make it had not been expressly granted by the legislature. If it be true, as the bill alleges, that this grant was "wholly invalid," where is the equitable jurisdiction of this court? In Oakland v. Carpentier, 21 Cal. 642, the city of Oakland filed a bill to set aside and cancel a grant made by ordinance of the city to Carpentier, of the exclusive right and privilege, for 37 years, of constructing wharves, piers, and docks at any point within the corporate limits of the town, with the right of collecting wharfage at such rates as he might deem reasonable. The grant was made in 1852. The suit was brought in 1854 to cancel the grant, and enforce a surrender of the interests and property transferred, or claimed to be transferred, thereby to Carpentier. The grounds alleged for the interposition of equity were that the grant or conveyance was obtained by fraud on the part of Carpentier, and was made without authority on the part of the trustees in whom the municipal powers of the city were vested, and that it constituted a cloud upon the title of the city, and embarrassed her in the exercise of her legitimate functions. The charges of fraud the court found wholly unsustained by the proofs, and thus disposed of the remaining allegations of the bill on which the city sought relief, in an opinion by Chief Justice Field, now associate justice of the supreme court of the United States:

"Stripped of the charges of fraud, the whole claim for equitable relief falls to the ground. The grant was either valid or void or voidable, or if, as contended by counsel for respondents, there can be no occasion for the interference of a court of equity if void, the condition of things—of the rights, privileges, and the estate of the city—remains as though no transfer had been attempted. No cloud is cast upon her title, and no embarrassment can attend the exercise of her legitimate functions. She has only to proceed and assert her privileges and claim her interest, and whoever interferes with them will be a trespasser. If, however, the grant is only voidable, and not void, the plaintiff, seeking aid of a court of equity, can only obtain equity by doing equity; that is, she can only obtain relief from the acts of the agents of the town by tendering compensation to the defendant, who relied upon them for his expenditures. If they [the ordinances of the board of trustees] are only voidable, that interference of a court of equity cannot be invoked until equity is done by the party claiming it; that is, by placing, or offering to place, the party relying upon the acts of the agents of the town in the same position which he would have occupied but for this reliance upon their validity."

A rehearing was asked in this cause, but denied in an opinion by Chief Justice Cope, who had succeeded Chief Justice Field on the latter's accession to the supreme court of the United States. The necessity of doing equity, as an indispensable condition to the granting of equitable relief, was stated with equal positiveness in the case of New Orleans v. Steamship Co., 20 Wall. 387, the general features of which are not unlike those of the case at bar, although it is not discolored by the stain of bad faith which marks the latter. The facts in the case were that in 1865, during the mili-

tary occupancy of New Orleans by the Union forces, the mayor, the board of finance, and the board of street landings, appointed by the commanding general of the department, pursuant to a resolution passed by said boards, executed, by the command of the mayor, to the steamship company, a lease of certain water-front property owned by the city, with the right to inclose and occupy for their exclusive use the demised premises for a term of 10 years, and to build thereon wharves, bulkheads, buildings, and other improvements, for which the lessee was to pay an annual rent of $8,000 in monthly installments, and for which it gave its promissory notes, —120 in number. The steamship company took possession, and expended over $65,000 in making the improvements specified in the lease, and duly paid its notes as they matured, down to April 11, 1866. On the 18th of March, 1866, the government of the city was handed over by the military authorities to its elective officers. On the 18th of April, 1866, the city surveyor, under an order of the city council, approved by the mayor, destroyed the lessee's inclosure, and did damage to the property amounting to $8,000. To restrain further acts of violence and obtain damages for that done, the lessees filed a bill. The notes for rent given by the company, and unpaid at the evacuation of the city by the military authorities, were duly delivered to the elected mayor and common council of the city, who had displaced the military mayor and boards. Those unpaid when the bill was filed were held by the city then. and for several months afterwards. They were tendered to the company by a supplemental answer, and deposited in court. The city neither tendered back the money paid by the company, nor disclaimed the validity of the payment, nor offered to return the amount, nor any part of it, expended by the company in making the improvements specified in the lease. It was contended on the part of the city in the court below, and on appeal, that the rights and powers of the military authorities terminated with the cessation of hostilities, and the restoration of business, and that they could not create an interest to last beyond that time, and, too, that no power but the city could alien the rights of the public in property held for its use, and transfer them to an individual or company to the exclusion of the public. The circuit court decreed in favor of the steamship company, and the supreme court of the United States affirmed the decree. Mr. Justice Swayne, who delivered the opinion, said:

"It has been strenuously insisted that the lease was made by Kennedy without authority, and was therefore void ab initio, and that, if this was not so, its efficacy, upon the principle of the *jus post liminium*, wholly ceased when the government of the city was surrendered by the military authorities of the United States to the mayor and council elected under the city charter."

Holding that the appointment of Kennedy as mayor, and of the boards of finance and street landings were valid, and that they were clothed with the powers and duty of their respective positions, and that the lease was within the scope of their authority, though they had no express authority to occupy, he says:

"But, conceding this to be so, it is insisted that when the military jurisdiction terminated the lease fell with it. We cannot take this view of the subject. The question arises whether the instrument was a fair and reasonable exercise of the authority under which it was made. A large amount of money was to be expended, and was expended, by the lessees. The lease was liable to be annulled if the expenditures were not made, and the work done, within the limited time specified. The war might last many years, or it might at any time cease, and the state and city be restored to their normal condition. The improvements to be made were to the welfare and prosperity of the city. The company had a right to use them for only a limited time. * * * When the military authorities retired, the unpaid notes were all handed over to the city. The city took the place of the United States, and became entitled to all their rights under the contract. * * * The company became bound to the city, in all respects, as it had been before bound to the covenantees in the lease. The city thereafter collected one of the notes subsequently due, and it holds the funds without an offer to return it, while conducting this litigation. It has also to be borne in mind that there has been no effort of adjustment touching the lasting and valuable improvements made by the company, nor is there any complaint that the company has failed, in any particular, to fulfill their contract. We think the lease was a fair and reasonable exercise of the power vested in the military mayor and the two boards, and the injunction awarded by the court below was properly decreed. The jus post liminium, and the law of nuisance, have no application to the case. We do not intend to impugn the general principles that the contracts of the conqueror, touching things in conquered territory, lose their efficacy when his dominion ceases. We decide this case upon its own peculiar circumstances, which are sufficient to take it out of the rule."

Mr. Justice Hunt, who concurred specially, held that:

"The reception and holding of the rent is a clear and unqualified act of ratification, which bars the defense of want of authority to execute the lease from which it issued. It is in violation of every principle of honesty and of sound morality that one should retain the benefit of an act of his agent, and at the same time repudiate such act."

It is to be noted that no express authority to make the lease was conferred upon the military mayor and the boards, but their action was sustained as within the lines of their duties as civil officers. Mr. Justice Field, who dissented on the ground that when military occupation ceased the property of the city reverted, with the title unimpaired, impliedly admitted that the reception and retention of rent, under the law, ratified it, even though it were the act of unauthorized public agents, but thought that the retention of the proceeds of a single note for $666, paid by the lessees, which was all that the city withheld, "might be justified or explained on the grounds consistent with the repudiation of the lease." The obligation to do equity as a condition of relief, here insisted upon, is simply and purely an application of the rule in actions where a contract is sought to be rescinded on the ground of fraud, and nowhere has this wholesome doctrine been more strongly inculcated than in Michigan. Merrill v. Wilson, 66 Mich. 243, 33 N. W. Rep. 716, and cases cited.

But it is argued that the common council exceeded its powers, and that all persons who deal with it are chargeable with notice of the limitations imposed by its charter. The public is exempt from responsibility for the acts of its agents beyond these powers, and no equities can avail the city's grantee, nor can numberless acts of

ratification heal defect of authority, or a transgression of the very letter of its charter. This would be true if the contract in question were prohibited by statute, or immoral; but when, as here, there is, at the utmost, only a defect of power, and even though specific performance of the contract might not be enforced, the corporation may be held liable, even at law, on a contract of which it has had the benefit, when it has induced a party, relying on its promise, and in execution of the contract, to spend money and perform his part thereof. This distinction has been frequently recognized and applied. Hitchcock v. Galveston, 96 U. S. 351; State Board of Agriculture v. Citizens' St. Ry. Co., 47 Ind. 407; Allegheny City v. McClurkan, 14 Pa. St. 81; Railway Co. v. McCarthy, 96 U. S. 258–267; Parkersburg v. Brown, 106 U. S. 487, 503, 1 Sup. Ct. Rep. 442; Chapman v. Douglas Co., 107 U. S. 355, 2 Sup. Ct. Rep. 62; Bank v. Townsend, 139 U. S. 67, 71, 11 Sup. Ct. Rep. 496; East St. Louis v. St. Louis Gaslight, etc., Co., 98 Ill. 415. If a court of law may go to this extent in enforcing the claims of common honesty, can there be doubt that a court of equity may mold its decree to the same end under like conditions? It is conceded that, were the city an individual, its attempt to repudiate its solemn obligations, recognized by it for a period nearly equal to that prescribed by the statute of limitation for bringing real actions, would justly be held wanting in good faith, but it is said that this rule cannot be enforced against a municipality. Do courts of equity extend immunity to municipal dishonesty? I find no warrant for that doctrine. "The obligation to do justice rests upon all persons, natural or artificial; and, if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation." Marsh v. Fulton Co., 10 Wall. 676; Louisiana v. Wood, 102 U. S. 299; Chapman v. Douglas Co., 107 U. S. 355, 2 Sup. Ct. Rep. 62; Bank v. Townsend, 139 U. S. 75, 11 Sup. Ct. Rep. 496; Clark v. Saline Co., 9 Neb. 516, 4 N. W. Rep. 246.

Or, as put in the vigorous language of Chief Justice Field, in Pimental v. San Francisco, 21 Cal. 362, "where the city, under a void ordinance, sold certain of its property, and retained the proceeds, and, when sued for the amounts, pleaded the invalidity of the ordinance, and sought to escape liability on the ground that the city was under no obligation to respond for the acts of its officers under that ordinance," the chief justice said:

"The city is not exempt from the common obligation to do justice which binds individuals. Such obligations rest upon all persons, whether natural or artificial. If the city obtained the money of another by mistake, or without authority of law, it is her duty to refund it, from this general obligation. If she obtained other property, which does not belong to her, it is her duty to restore it, or to render an equivalent therefor, from the like obligation. Argenti v. San Francisco, 16 Cal. 282. The legal liability springs from the moral duty to make restitution, and we do not appreciate the morality which denies, in such cases, any rights to the individual whose money or other property has been thus appropriated. The law countenances no such wretched ethics. Its end, always, is to do justice."

I am unable to perceive any distinction between the morality of retaining money dishonestly acquired, and that involved in denying

compensation for expenditures and investments made in good faith, on the express request and assurance of the individual or corporation, private or public, which has obtained, and still holds, the benefit of such outlays. Nor is it easy to see the honesty or equity of permitting the municipality to pocket the taxes which it has received under the very ordinance it seeks to repudiate, until the statute of limitations has run against their recovery by the defrauded party. But it is not true that the law casts upon a party dealing with a municipal corporation all the consequences of a misconstruction of its powers, and leaves him remediless. Where there has been a practical construction of its charter given by the authorities of a municipality and that construction, though of doubtful validity, has been acted upon by it, and rights have grown up under it, the court shall uphold it, in favor of one who has dealt in good faith. Van Hostrup v. Madison, 1 Wall. 297; Chicago v. Sheldon, 9 Wall. 54; Insurance Co. v. Hoge, 21 How. 35, 36; U. S. v. Union Pac. R. Co., 37 Fed. Rep. 551; U. S. v. Hill, 120 U. S. 169, 7 Sup. Ct. Rep. 510; Brown v. State, 5 Colo. 496; Port Huron v. McCall, 46 Mich. 565, 10 N. W. Rep. 23; Cameron v. Bank, 37 Mich. 240.

Upon the theory that the maintenance and operation of the railway in the streets is a public nuisance, the complainant's case is equally unsustainable. There is no averment or allegation which, under any system of pleading, or by the extremest stretch of liberality, can be tortured into a charge that the defendants' occupancy of the streets is either a public or a private nuisance, cognizable in equity, or that the right to the relief here asked is predicated on that theory. Whether or not a given use of a highway is a nuisance, is a question of fact, to be tried on apt allegations. "When the highway is not restricted in its dedication to some particular mode of use," says Judge Cooley, "it is open to all suitable methods; and it cannot be assumed that these will be the same from age to age, or that new means of making the way useful must be excluded merely because their introduction may tend to the inconvenience, or even injury, of those who continue to use the road after the same manner as formerly. A highway established for the general benefit of passage and traffic must admit of new methods of use whenever it is found that the general benefit requires them; and if the law should preclude the adaptation of the use to the new methods it would defeat, in a greater or less degree, the purposes for which highways are established." Macomber v. Nichols, 34 Mich. 216. Again he says, in Railroad v. Heisel, 38 Mich. 66: "A street railway for local purposes, so far from constituting a new burden, is supposed to be permitted, because it constitutes a relief to the street. It is in furtherance of the purpose for which the street is established, and relieves the pressure of local travel, instead of constituting an embarrassment." And Judge Grant, on the same subject, says that "the street railways have become, not only a convenience, but a necessity, to the people." Railway v. Mills, 85 Mich. 648, 48 N. W. Rep. 1007. They cannot, therefore, be, per

se, a nuisance. See, also, Attorney General v. Metropolitan R. R., 125 Mass. 516–518. Indeed, the bill practically admits this, in its lack of averment, and notably in concession that the object sought by the bill is purely the resale of the license to some other corporation, which will pay a larger sum for the privilege now exercised by the defendant. But while admitted that the use of the streets sought to be enjoined is consistent with the public easement of travel, the conclusion is reached that the extension of the easement by the common council being void, as wholly ultra vires the city, the defendant's occupancy of the streets with its tracks, and in the operation of its railway, being therefore unauthorized by law, it is the province and duty of a court of equity to enjoin such use. The only authority cited for this conclusion is Denver v. Denver City Ry. Co., 2 Colo. 673. The case cites Davis v. Mayor, 14 N. Y. 525, which, in its turn, cites several authorities holding that the unauthorized obstruction of the public highway is a nuisance,— a proposition which, in the abstract, no one will question. Nor is it denied that, in a proper case, equity will enjoin the continuance of such an obstruction. But in this state it is held that a public nuisance must be something that subjects the public to inconvenience or annoyance. The mere use of the street does not make out the offense. People v. Carpenter, 1 Mich. 273; Clark v. Ice Co., 24 Mich. 508; Attorney General v. Evart Booming Co., 34 Mich. 462; Everett v. City of Marquette, 53 Mich. 450–452, 19 N. W. Rep. 140.

In the latter case the common council had granted complainant a license to construct a railway from the sidewalk down to the basement of his store. Ten years afterwards the council directed the stairway to be removed, and the opening in the sidewalk closed. It was contended on the part of the city that the common council had no power to give permission for the permanent appropriation of any one of the public streets for private purposes. Referring to the permission granted by the first council, Judge Cooley said:

"If the permission was effectual for no other purpose, it at least rebutted any presumption, which might otherwise have existed, that this practical appropriation of the street was, per se, a nuisance. If the permission was a mere license, and the subsequent action of the city council is to be regarded as a revocation of the license, it does not follow that the plaintiff had, by the revocation, immediately been converted into a wrongdoer."

The decree of the court below awarded a perpetual injunction against the city, which the supreme court affirmed. It seems to me impossible to reconcile this case with the conclusion of the circuit judge that the revocation of the ordinance of 1879 by that of March 29, 1892, operated to convert the defendants into wrongdoers, and make them amenable to injunction. To warrant the interposition of a court of equity against unauthorized acts, even at the instance of the state, there must be a tangible grievance,— a substantial invasion of the public right. Attorney General v. Metropolitan R. Co., 125 Mass. 516; Brick Co. v. Foster, 115 Mass. 432–438; Attorney General v. Sheffield Gas Consumers' Co., 3 De Gex, M. & G. 304–320, on appeal 4 Ch. App. 71. It may be said, in

this connection that it admits of grave doubt whether, in its corporate capacity, the city can maintain this bill, under any conditions, to redress a public grievance. Its standing as complainant in the case, where it sought like relief against the occupation of its streets by a railroad company, was characterized "as not by any means clear, upon the authorities." Detroit v. Detroit, etc., R. Co., 23 Mich. 216. See, also, City of Georgetown v. Alexandria Canal Co., 12 Pet. 97.

2. As a bill quia timet, it must fail. Frost v. Spitley, 121 U. S. 552, 7 Sup. Ct. Rep. 1129. The second question, of almost equal importance, is, conceding that the city exceeded its powers in granting an extension of the easement in its streets for a period beyond the life of the grantee, will a court of equity relieve either party from the contract? Upon this question the case of St. Louis, etc., R. Co. v. Terre Haute, etc., R. Co., 145 U. S. 393, 12 Sup. Ct. Rep. 953, leaves nothing to be said. It is conclusive against the complainant. If, as is claimed, the city acted ultra vires in the extension of the easement granted to the Detroit City Railway Company, and the latter exceeded its chartered powers in accepting the grant, both are in pari delicto, and can have no relief. If the street railway, by mistaken construction of the city's charter, is precluded from compensation for its expenditures, and recovery of the sums paid for taxes, as is held by the circuit judge, is the same mistake of law on the part of the municipality to be made a ground for granting it affirmative relief? The only answer to the case last cited necessarily affirms this strange result, for which I can find no sanction.

3. The construction given to section 34 of the tram-railway act, (which makes the consent of the municipal authorities the condition precedent to the local exercise of its franchises by a street-railway company,) by which it is interpreted as a limitation of the power upon the city to grant, and of the corporation to receive, the easement in question, seems to me an utter perversion of its purpose. Independent of that section, and under the powers conferred by its charter, the city could license the use of its streets by such corporations, the privilege being in furtherance of the purpose of the street, although it could not grant an exclusive right. That section has been thus authoritatively construed:

"The purpose of section 34, in allowing street railways to be organized under it on such terms as should be agreed upon, was to enable the roads and the cities to fix upon some equitable standard of local taxation for municipal purposes." City of Detroit v. Detroit Ry. Co., 76 Mich. 425, 43 N. W. Rep. 447.

This construction of section 34 binds this court. By section 12 of the act of 1855, companies formed thereunder may acquire and sell real and other property for their uses, and the same right is conferred by section 15 of the street-railway act, (chapter 95, 1 How. St. p. 911,) which, by section 29, gives to companies formed under the tram-railway act all the rights, powers, and privileges granted by it. It has not been contended that either of these sections disabled such corporations from acquiring the fee of realty, or the ab-

solute title to any other property. Had it been the purpose of section 34 to restrict the dealings of the company with the municipality, that intent would have been so easy of expression that the absence of a prohibitory or limitation clause is persuasive, per se, that the term as well as the conditions of the easement were committed to the wisdom and integrity of the city authorities, who were vested with the contract power of the city. Putnam v. Grand Rapids, 58 Mich. 419, 25 N. W. Rep. 330. But it is said that, if it be held that the city may grant to a corporation a privilege extending beyond its corporate life, it necessarily follows that it may make a grant in perpetuity. There are several answers to this proposition: (1) This case does not involve the power to make a perpetual grant. The question here is whether the extension of the easement for 16 years, for the considerations received by the city, was a reasonable exercise of the municipal power. It does not follow from the fact that power is liable to be abused that it does not exist. If the power is abused, the remedy is with the legislature. Wiggins Ferry Co. v. City of East St. Louis, 107 U. S. 367, 2 Sup. Ct. Rep. 257; Gilman v. Philadelphia, 3 Wall. 732. (2) The legislature alone can challenge the propriety of the exercise of the power. It has reserved to itself the power to annul, alter, and repeal both the municipal and the corporate charter. Whether the city or its grantee have transgressed their organic acts is solely for the state. If the company acquires more property, or a larger estate, than the legislature has authorized it to receive, the other party to the contract cannot object, when the contract has been perfected by extension. Railway Co. v. Mills, 85 Mich. 648, 48 N. W. Rep. 1007, and cases cited; Jones v. Habersham, 107 U. S. 174, 2 Sup. Ct. Rep. 336; California State Tel. Co. v. Alta Tel. Co., 22 Cal. 399.

Another argument for the construction that the grant must be limited to the life of the corporation is that such a construction consists with the policy of the state relative to corporations. It has been aptly said of this argument that the supposed policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each varying from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of the statutes. Hadden v. Collector, 5 Wall. 111; Railway Co. v. Phelps, 137 U. S. 536, 11 Sup. Ct. Rep. 168. Again it is said that it is not the function of a court of equity to decide, even upon all the facts in the case, whether the contracting question is or is not a reasonable exercise of the municipal power. That, however, was exactly the question decided by the supreme court in New Orleans v. Steamship Co., 20 Wall. 387. There is no legal obstruction to prevent the court from passing on that feature of the case. Is there any practical difficulty attending the solution of the inquiry? It is a mere question of mathematics, —a schoolboy's problem.

Given an enterprise, the construction, equipment, and operation of a railway for example, for thirty years,—the company to furnish

the funds, and take all the hazards of the business and of remunerative returns, and to pay a prescribed percentage of its gross receipts in return for the license,—is the contract a reasonable one for the grantor of the license, having in mind the amount of the investment required, the equalization of the burdens of municipal taxation among the community, and the increased facilities of cheap transportation? That it may result eventually in large returns to the investors is plainly not a negation of its fairness now. If it fail to prove as remunerative as expected, can the grantee, on that ground, escape his burdens? If acted upon for 14 years, and regarded by both parties as superseding a prior contract and defining their relations, and affirmed by one party as the basis of recovery against the other, by successful litigation, there is no principle, consistent with sound morality, that will permit its reasonableness, or even its constitutionality, to be questioned now, at the suit of the grantor, who seeks, in bad faith, to impugn its own grant. Daniels v. Tearney, 102 U. S. 421. The bill should be dismissed, with costs.